THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEROME THOMAS, Defendant-Appellant.

First District (3rd Division)   No. 1—05—2778

Opinion filed December 19, 2007.

Michael J. Pelletier and Aliza R. Kaliski, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, and Jon Walters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

In a bench trial, the defendant Jerome Thomas was convicted of two counts of first degree murder and one count of home invasion, receiving a sentence of natural life imprisonment, concurrent with a 30-year prison term. On appeal the defendant does not contest the sufficiency of the evidence of his guilt. He seeks a new trial on the follow-

ing grounds: (1) his trial counsel was ineffective for eliciting the defendant's testimony concerning the details of previous home invasions committed by the defendant; (2) the trial judge abused her discretion when she barred expert testimony concerning the unreliability of eyewitness identification; (3) because the trial judge was a longtime friend of defense counsel, she erred in denying the defendant's request that she recuse herself from hearing the defendant's motion for a new trial, which was based on a claim of ineffective assistance of counsel; and (4) the trial judge erred by, *sua sponte*, allegedly taking judicial notice of the time it would take to cook a particular meal thereby impeaching the alibi testimony of the defendant's mother. For the reasons set forth below, we find no reversible error and affirm the defendant's convictions and sentences.

## BACKGROUND

This trial commenced on March 4, 2004, about eight years and two months after the occurrence. The State's evidence established the following. On Christmas Eve 1995, several armed men entered the home of Leon and Lucille Fields (Fields) in an apparent attempt to steal drugs and money. In addition to the Fields, also in the home that evening were their nephew, Victor Wallace, their niece, Latanya Wallace, and her cousin, Kenneth Fields, their daughter Angela Fields, Angela's children, Larry Fields and Loreen Monique Phillips, and Angela's nephew, Auvion Strong. Before the men left that evening, they had shot to death Leon and Victor.

Angela, approximately 29 years old at the time of this incident, testified that shortly after 11 p.m. that evening she was in her parents' basement where her children, Larry and Loreen, and her nephew, Auvion, were sleeping. As Angela lay in bed, a man with a gun approached her and ordered her to get out of bed. The room was illuminated with a dimmed lamp and a nightlight. The man wore an orange-beige jumpsuit and had a skullcap covering his forehead. When she got up, the man grabbed her by the hair and began to take her toward the stairs that led to the first floor. She then saw her father, Leon, standing at the bottom of the stairs with a gun. Leon attempted to shoot her captor, but the gun jammed, and the man shot Leon in the side and then chased him up the stairs. Angela tried to run out of the basement, but she was stopped by another armed man, whom she identified at trial as the defendant, who told her, "Bitch, put your hands up in the air before I kill you." The man was wearing a jumpsuit identical to that of the first intruder, carried a flashlight, and had a device in his ear which appeared to be a phone or a walkie-talkie. He identified himself as a police officer and forced her upstairs, where she saw Leon lying in the hallway.

The defendant took Angela into her brother Dexter's bedroom and placed her on the bed. Dexter was not at home. He rifled through a closet in that room for three to four minutes, while Angela watched him. He then turned around and threatened to kill her if she did not put her face "to the bed." He also struck her in the head with his flashlight and asked her where the "keys" were, which she understood as a reference to drugs. The defendant left the room and a third man came in and rifled through drawers and other items in the room. As he left the room she heard him say, "Man, if that bitch don't tell us where it's at, we are going to have to kill her." The defendant reentered the room and again asked her where "it" was. She told him to look under the bed, so he made her get up. When she did so she looked at him face-to-face, but he ordered her to lie on the floor, saying he would have to kill her if she kept looking at him. He then flipped over the bed and took some items, which he hid on his person.

Angela then heard a commotion in the hall, with people asking about Dexter. She heard her cousin, Victor, tell them to leave them alone and "go on 57th and find Dexter." The next thing she heard was a gunshot and she did not hear Victor's voice again. The men then left, and as they ran outside, she heard one of them say, "Why did you shoot that boy?" When Angela left the bedroom, she saw her father and Victor lying on the floor, and she ran across the street to her uncle's house and summoned the police.

A few weeks later Angela, her mother, and other family members were watching the news on television when Angela saw the defendant and several of the other home invaders, accompanied by police officers. She and her mother reported this to the police, and about a week later, on February 8, 1996, she and other family members were summoned to the police station to view a lineup. Angela was shown a photo array, but she testified that these pictures depicted the men when they were much younger, and to be certain of her identification, she asked the police if she could see the men in person. She was then shown a lineup in which she identified the defendant and an unspecified number of the other home invaders.

Angela's son Larry was nine years old when these events occurred. He testified that he was asleep in the basement and was awakened by a loud noise and the sound of people walking upstairs. When he did not see his mother in the basement, he woke up his cousin Auvion and they walked upstairs. There, Larry saw his grandfather Leon lying on the floor and his cousin Victor sitting in the bathroom doorway. A man standing behind a door claimed they were police officers and ordered the two children to lie on the floor. Larry lay on his side. A man wearing a black jumpsuit and a black vest stood over them. He had a radio

on his hip and a headset connected to it. Next, a man identified in court by Larry as the defendant changed places with the man in the black jumpsuit. The defendant was wearing a brown or beige jumpsuit, with a scarf covering his eyes and mouth and a hat pulled down. However, the scarf was subsequently lowered so that Larry, from a distance of about three feet, could see the defendant's entire face. According to Larry the light from the bathroom was bright and he was able to "get a good look" at the defendant's face. The defendant stepped over Larry, shot Victor, and then left with the other man. According to Larry there were four offenders at the scene. The third and fourth men were also wearing beige jumpsuits like the one worn by the defendant. Larry testified that he identified the defendant in the February 8, 1996, lineup as the man who killed Victor.

Lucille, the wife of murder victim Leon Fields, testified that on the night of the occurrence she was awakened by a noise like gunshots. She ran to her bedroom door, where she saw Leon lying on the floor in the hallway. She realized someone else was there and tried to run back to her bed, but that person told her he had a gun and ordered her to crawl on the floor. She could hear someone calling her daughter a bitch and asking where the "keys" were. She then heard someone saying, "Get the keys out of his pocket, he got the keys." She heard Victor pleading, saying that they had no keys and no money. She then heard a gunshot and did not hear Victor anymore. She lay on the floor until one of her children shook her and she then fled the house in a panic.

Latanya Wallace was approximately 17 years old at the time of this occurrence. She testified that she and her cousin, Kenneth Fields, were sleeping in a back bedroom of the house when she heard the sound of arguing and two gunshots. Someone knocked at the door and Kenny asked who was there but received no response. When Kenny again asked who was there, another shot was fired and someone kicked the door open. Someone with a flashlight ordered them to stand up, and they were then escorted to the kitchen, where Latanya saw two intruders, one wearing a dark jumpsuit and the other wearing a lighter one. Both men had guns, and one man had an earpiece. She had been able to see their noses, mouths, eyes and foreheads as they emerged from the bedroom. She identified the defendant in court as the man in the lighter jumpsuit with the earpiece. He was wearing a hat but she was able to see his face.

Latanya was ordered to lie down with her family in an area adjacent to the bathroom. She heard the men repeatedly ask where the "keys" were. One man said, "Someone going to die tonight, ya going to have a fucked up Christmas." They told her brother, Victor,

"Man, it look like you know something." Victor told them he knew nothing and did not even live there. The men then told Victor to stop looking at them.

Latanya also saw the defendant on the news in January while at her parents' home, and she subsequently identified him in the February 8, 1996, lineup. She testified that she was able to identify him then because she would never forget his face and because she recognized his voice when the police made each of the men in the lineup say, "I'm going to kill you, bitch, where the keys, I'm going to kill you bitch." On cross-examination Latanya testified that during the intrusion the men were wearing masks, but she clarified that the masks were rolled up on top of their heads.

Kenneth Fields was 15 years old at the time of this occurrence. His testimony substantially corroborated that of Latanya. He was also able to describe the person who kicked in the bedroom door as wearing all black, with a black hood on his head, carrying a flashlight and a pistol. He could only see part of that person's face because it was covered from the tip of the nose down. A second man took him into the hallway, where he saw the Fields, his little brothers and his cousins lying on the floor and his other cousin (Victor) in the bathroom. The second man asked Kenneth where the "keys and the Gs" were. Kenneth testified that at that time he did not know what this meant, but at the time of trial he understood this to be a reference to money and a lot of drugs. Kenneth told the man he did not know the location, and the man struck him with a gun, knocking him to the ground and causing a head injury. From that position, Kenneth was still able to see two men standing over Victor in the bathroom, although he could not see their faces. They were also asking Victor where the "keys and Gs" were. Victor said he did not know, and told them to "take that back to 57th." Kenneth then heard a single gunshot.

Kenneth described the man who struck him with a gun as wearing a "goldish brown jumpsuit," with nothing covering his face, but a knit skullcap on his head. Kenneth also testified that he had seen this man "[s]ometimes in the neighborhood" before that night. He identified the defendant in court as this man. Several weeks after the occurrence, while watching television with his father, he saw the defendant on the news. He subsequently identified the defendant in the February 8, 1996, lineup. Kenneth admitted that the police had told him they thought the people from the house were in the lineup. He also stated that he was not the first to view the lineup, and family members who viewed it first would come back into the waiting room and discuss which of the offenders they had identified. Kenneth denied that there was any discussion among family members of the place in the lineup of any of the offenders.

Some aspects of this eyewitness testimony were impeached through the stipulated testimony of investigating police officers. The parties stipulated that Chicago police officer V. Brown would testify that at the scene after the occurrence he questioned Angela, Lucille, Latanya, Kenneth and Larry. They described three offenders age 20 to 30. All three offenders were 5 feet 10 inches and weighed from 145 to 150 pounds. The presentence investigation report describes the defendant at the time of trial as 6 feet 2 inches and 210 pounds. Those witnesses also stated that two of the offenders wore dark hoods and dark slacks. It was further stipulated that Officer Gerardi or Detective Kurtz would testify that they prepared reports in which Lucille and Angela both described one offender as armed, black, and wearing dark clothes. Finally, it was stipulated that Detective Kurtz submitted a report in which Latanya said there were three and possibly four offenders (she heard three distinct voices) who all wore dark clothes and masks.

Over defense counsel's objection, the State elicited the testimony of the victim of another home invasion who identified the defendant as one of the perpetrators of that crime, committed about two weeks before the offenses for which defendant was being tried. The State contended that the facts of that case were so similar as to permit its introduction to prove *modus operandi*. The court struck this testimony, finding that there were insufficient similarities to the offense at issue.

The parties stipulated to the medical examiner's findings that Victor Wallace died of a single gunshot wound to the chest and Leon Fields died from seven gunshot wounds, two of which caused massive internal bleeding.

The defendant presented an alibi defense. The defendant's sister, Tiffany Thomas, testified that at about 2 p.m. on the day in question she and two siblings and their mother left their home at 60th Street and Hermitage Avenue on the south side of Chicago to go shopping at Gurnee Mills in Gurnee, Illinois. She saw the defendant at the house before they left. They left the Gurnee Mills mall at about 10 p.m. and it took them 45 minutes to drive straight home. Defendant was in the living room with his ex-girlfriend, listening to the radio. When Tiffany went to bed at about 1 a.m. the defendant was still there.

The defendant's mother testified that when they left for the mall they left the defendant at the house with her grandchildren. When they returned home, at about 10:30 p.m., the defendant was watching television with his ex-girlfriend. At about 11:30 that evening, defendant's mother began to prepare a traditional family holiday dinner of chitlins, collard greens, macaroni and cheese, sweet potato pies and cakes. She first had to clean the chitlins, cut up the greens, and

prepare the dressing as well as prepare the pies and cakes. Between 11 p.m. and 12 midnight the defendant came into the kitchen to taste the food. The defendant's mother went to bed between 2 and 2:30 that morning, leaving the defendant watching television in the front room. She testified that she had discussed the case three or four times with defense counsel. She first heard of the defendant's January 1996 arrest on the news. At that time she did not go to the police to tell them about his alibi. Nor had she told anyone outside of the family until a few months before trial. However, she clarified this testimony by stating that over five years before trial she had told two women of the defendant's alibi. One of those women said she was an attorney representing the defendant.

The defendant testified on his own behalf that he had arrived home at about 7 or 8 p.m. on the night in question. When his mother and sister arrived, he had the radio and television on. At about midnight his mother was cooking. Defendant denied ever having spoken to his mother about his case and said she never came to visit him in jail. He admitted that the crime scene was seven or eight blocks from his mother's home and that he had been to the house where the crime occurred two or three times before the incident. Defendant asserted that he and Dexter had been friends since high school. Defendant also testified that he had been introduced to Angela and once saw Kenneth Fields at Dexter's house. On three occasions the defendant obtained drugs from Dexter at Dexter's house. Dexter gave him drugs one time, and on two occasions the defendant bought drugs from Dexter, once in Dexter's room and once in front of the house. The defendant testified that he knew that Dexter was a "big time drug dealer." On one occasion defendant gave Dexter $1,500 to buy a car.

Defendant denied having committed the crimes for which he was charged. But he admitted that from the date of his release from prison in August 1995 until his arrest in January 1996, he committed eight other robberies and home invasions with Donald McCoy, a Chicago police officer, and Robert Walker. They committed these crimes in the mornings, posing as Cook County sheriff's deputies and using a false search warrant to gain entry. There was only limited violence involved in those home invasions. On one occasion, Officer McCoy hit someone. Nobody was ever shot or seriously injured. None of the men wore masks or hoods during these other crimes since they were posing as sheriff's deputies. Defendant would wear black jeans, and Officer McCoy would wear a beige coat or a tan jumpsuit. Defendant denied that he had a radio, but McCoy had one and knew how to operate scanners. It was Officer McCoy who directed them to the targeted homes, utilizing the information he received as a police officer.

In rebuttal, Angela testified that Dexter had never introduced her to the defendant, whom she had never met before the occurrence. She admitted that Dexter was a drug dealer.

## ANALYSIS

■ Defendant contends that his trial counsel was ineffective for eliciting from him detailed testimony concerning eight previous home invasions and robberies which he admitted committing from the time of his release from prison in August 1995 until his arrest for the crime in question in January 1996. We find no merit to this contention. Counsel was clearly engaging in a reasonable, albeit ultimately unsuccessful trial strategy. The defendant took the stand, of necessity, to testify to his alibi. He was very likely to be impeached with these prior offenses, and, as we will discuss, the trial judge had presided over his previous cases for the prior offenses. Defense counsel attempted to use the impeachment evidence to defendant's benefit, eliciting testimony from defendant outlining the differences between the other offenses and the ones for which he was being tried. It was brought out that the other offenses occurred in the daytime, not at night; entry was by the false pretense of a search warrant by alleged sheriff's deputies rather than a surreptitious entry, and nobody was shot or seriously harmed. Also, because the perpetrators claimed to be sheriff's deputies, they did not wear masks or hoods. Certainly there were also similarities, like the claim of being law enforcement officers and the use of radios. This strategy was employed in the face of overwhelming evidence being brought forward against the defendant. Although these other crimes were home invasions, they were very different from the one for which the defendant was being tried. It is clear that the strategy was employed to bolster defendant's alibi. Under these circumstances, we cannot say that this strategy was unreasonable.

It is noteworthy that neither defendant nor his posttrial counsel raised this issue in any of defendant's posttrial motions. We could therefore consider the matter waived, as we do not find that counsel's conduct in the case constituted plain error. See *People v. Moore*, 279 Ill. App. 3d 152, 156, 663 N.E.2d 490, 494 (1996). But even more importantly, at the hearing on these two posttrial motions alleging trial counsel's ineffectiveness, trial counsel testified that it was *defendant* who wanted to testify to the facts of these other crimes in order to establish how different they were. The trial judge found this testimony to be credible. Her decision was supported when, in allocution at his sentencing hearing, defendant himself told the court that he had wanted to testify concerning the prior crimes because he believed the facts of those cases would contradict the State's case

against him. A defendant cannot participate in and agree to a procedure and then challenge his conviction based upon that same procedure. *People v. Harvey*, 211 Ill. 2d 368, 385-86, 813 N.E.2d 181, 192-93 (2004). Furthermore, because the evidence in this case was overwhelming, with four eyewitnesses identifying defendant as one of the intruders, and one of those eyewitnesses being someone who had previously known the defendant from the neighborhood, under *Strickland v. Washington*, 466 U.S. 668, 687-94, 80 L. Ed. 2d 674, 693-94, 104 S. Ct. 2052, 2064-65 (1984), defendant would not be able to establish that he was prejudiced by counsel's alleged ineffectiveness. We also note that defendant's reliance on *People v. Phillips*, 227 Ill. App. 3d 581, 592 N.E.2d 233 (1992), is misplaced. There, defense counsel elicited hearsay testimony from a police officer that another man had named defendant as the likely perpetrator and had stated that he believed this because he and the defendant had committed another robbery together. The reviewing court found this to be reversible error, calling the effect on defendant's case "devastating." *Phillips*, 227 Ill. App. 3d at 590, 592 N.E.2d at 239. In *Phillips*, the defendant's conviction was based on the testimony of one eyewitness who had seen him for only about one minute and who first identified him in a photo array 10 weeks after the crime. The court also noted that it was clear that counsel did not know what the other man had said before he elicited the answer from the police officer.

Also unavailing is the defendant's reliance upon *People v. Salgado*, 200 Ill. App. 3d 550, 558 N.E.2d 271 (1990). In that residential burglary case, defense counsel called the defendant as a witness and elicited from him his admission that he had committed the burglary. The trial court, in finding the defendant guilty of residential burglary, noted that it would have only found him guilty of theft had it not been for his testimony. In closing argument defense counsel had merely argued that the defendant had a right to explain his conduct. Under these circumstances the reviewing court correctly found reversible error because of ineffective assistance of counsel, where counsel had no discernible reason for eliciting that testimony and had effectively deprived the defendant of his right to an adversarial hearing. *Salgado*, 200 Ill. App. 3d at 553, 558 N.E.2d at 274. In the case before us, four eyewitnesses identified the defendant, including one who had seen him before. Also, trial counsel knew exactly what answers he would receive from the defendant concerning his prior crimes, and as we have noted, counsel had a reasonable strategic basis for eliciting this testimony. Accordingly, we find no merit to defendant's contention.

■ The defendant next asserts that he was denied a fair trial when the trial court barred him from presenting expert testimony from Dr.

Elizabeth Loftus concerning the fallibility of eyewitness testimony. This issue was also omitted from any of the defendant's pretrial motions and it is therefore waived. *People v. Nieves*, 193 Ill. 2d 513, 527, 739 N.E.2d 1277, 1283 (2000). We do not find any basis for a plain error analysis, because the evidence of guilt was very strong and there was no error such as would deny the defendant a fair trial. *People v. Ramos*, 318 Ill. App. 3d 181, 186-87, 742 N.E.2d 763, 769 (2000). The eyewitnesses were thoroughly cross-examined as to discrepancies in their testimony and indeed were impeached in some respects by the stipulated testimony of police officers who had questioned them in the immediate aftermath of the occurrence. This was a bench trial, and the trial judge made clear in her findings that she paid very careful attention to the eyewitness testimony. She found the evidence of defendant's guilt to be overwhelming and described the eyewitness testimony as "excellent," "very good," and "exceptionally credible."

Even on the merits we would find no error in the decision of the trial judge. Our supreme court has held that, under appropriate circumstances, expert testimony concerning eyewitness identification may be helpful, but it stressed that this was a matter for the sound discretion of the trial court:

"A trial judge is given broad discretion when determining the admissibility of an expert witness, and when considering the reliability of the expert testimony, the judge should balance its probative value against its prejudicial effect. In the exercise of his discretion, the trial judge should also carefully consider the necessity and relevance of the expert testimony in light of the facts in the case before him prior to admitting it for the jury's consideration. In this case, we conclude that based on the offer of proof it was proper for the trial judge to exclude the expert testimony." *People v. Enis*, 139 Ill. 2d 264, 290, 564 N.E.2d 1155, 1165 (1990).

*Enis* was a death penalty case, tried by a jury, and involved three eyewitnesses who viewed the defendant under difficult circumstances, two as he was running and one from a moving car. Despite these circumstances, our supreme court found no abuse of discretion by the trial court in barring the expert testimony concerning eyewitness identification. *Enis*, 139 Ill. 2d at 290, 564 N.E.2d at 1165.

Although neither the defendant nor the State cited the recent, scholarly opinion of this court, *People v. Allen*, 376 Ill. App. 3d 511 (2007), we further examine defendant's contention in light of this recent case. *Allen* reexamines the question of expert testimony on the reliability of eyewitness identification. In that case, the court found that previous Illinois cases had consistently upheld a trial court's denial of expert testimony on this issue. *Allen*, 376 Ill. App. 3d at 522-

23. However, the *Allen* court also concurred with previous Illinois cases which made it clear that in making this decision, trial courts have an obligation to carefully review the proposed testimony to determine its relevance to the facts of the case. *Allen*, 376 Ill. App. 3d at 523, citing *People v. Tisdel*, 338 Ill. App. 3d 465, 468, 788 N.E.2d 1149, 1151 (2003). Although defendant's choice of a bench trial was not made until after the *Allen* decision was handed down, we find it relevant to our consideration. We note that this case was not tried before a jury but rather before an experienced trial judge. The *Allen* case involved a charge of attempted murder and was tried before a jury with a single eyewitness who was shown a photo array after learning the police had a suspect in custody and who was not asked to identify the defendant in person until the preliminary hearing, 44 months after the crime, where the defendant was wearing a jail uniform and sitting with his attorney at the defense counsel's table. Under those circumstances, the appellate court found that the trial court had not seriously considered the relevance of the proposed expert testimony in light of the facts of the case. The defendant's convictions were reversed and the cause remanded for a new trial at which the trial court was instructed to conduct an appropriate inquiry. *Allen*, 376 Ill. App. 3d at 526.

In the case before us, the trial court clearly gave serious consideration to the admission of the expert testimony. The court noted that under the authority of *Enis* and *Tisdel* this decision was within the court's discretion and that those cases concerned aiding jury deliberations. The judge also noted that this case involved four separate identifications, all occurring just over one month after the occurrence. Based upon all of these considerations, we determine that even on the merits, the trial court did not err in excluding the proposed expert testimony. We also note that both parties on appeal have presented us with treatises and other studies concerning whether there are serious problems with eyewitness identification evidence. Because of our resolution of the issue, we need not explore that topic any further in this opinion.

■ We find no merit to the defendant's contention that the trial judge erred in denying his posttrial motion for recusal because of her friendship with the defendant's trial counsel. Two years before trial commenced, the trial judge and defense counsel disclosed at length, on the record, that they had been friends for years. Trial counsel had helped to organize the trial judge's election campaign 10 years earlier, and she had presided over the marriage of his daughter. Addressing the defendant directly, the trial judge stated that the defendant would be treated like any other litigant. The defendant responded that he

would not expect any different treatment and had "no problem" with the judge conducting his trial.

It was not until after the trial court had entered its guilty findings that defendant moved for the judge's recusal. The defendant also filed posttrial motions asserting that his trial counsel had been ineffective in his representation. The trial judge denied the motion for recusal but informed the defendant that he had a right to file for a substitution of judge (SOJ) for cause and that such a motion would be heard by a different judge. Defendant declined this offer and again told the judge that he had "no problem" with her and that she had "always been fair" with him. Defendant never filed an SOJ and proceeded to the hearing on these motions and to his sentencing hearing without renewing his request for recusal.

It is noteworthy that in the hearing on the defendant's claim that trial counsel was ineffective, trial counsel testified that he had urged the defendant to take a jury trial, but defendant had insisted on a bench trial. The trial judge found this testimony to be credible. The trial judge also noted that in two prior trials of the defendant over which she had presided, he had received minimal sentences, and she suggested that this would explain his decision to be tried by her. The defendant had previously received the minimum six-year prison term for armed robbery from this same judge. She had also convicted him of multiple counts of home invasion while imposing only concurrent prison terms of 22 years.

We find that the defendant explicitly waived the basis for his recusal motion when he told the judge that he had no concern about her and that she had always been fair with him. He also did not act upon her advice that he had a right to file an SOJ, to be heard by a different judge. Under these circumstances, the waiver doctrine is appropriately applied to bar the defendant from making this argument on appeal. See *People v. Moore*, 199 Ill. App. 3d 747, 767-68, 557 N.E.2d 537, 551-52 (1990). *People v. Bach*, 74 Ill. App. 3d 893, 895-96, 563 N.E.2d 563, 566 (1979).

Even on the merits we would find no basis for reversal. Illinois case law makes it clear that a mere friendship between a judge and trial counsel, or even counsel's involvement in the judge's election campaign at a remote point in time, does not, without more, require recusal of the trial judge from a case litigated by that counsel. *People v. Buck*, 361 Ill. App. 3d 923, 933, 838 N.E.2d 187, 196 (2005) (mere friendship between counsel and the trial judge was an insufficient basis); *People v. McLain*, 226 Ill. App. 3d 892, 904, 589 N.E.2d 1116 (1992) (no basis for disqualification although attorney had chaired judge's election campaign in the past, the two were neighbors, and the

judge's wife was godmother to one of the attorney's children). The defendant's reliance upon *People v. Bradshaw*, 171 Ill. App. 3d 971, 525 N.E.2d 1098 (1988), is misplaced, for the facts of that case raised significant inferences of possible bias and undue influence. In that trial for aggravated battery, a deputy sheriff who was the mother of the victim and who worked in the same building where the trial was held passed a note to the judge and then met privately with the judge in the judge's chambers during trial, a meeting which the judge disclosed only when faced with the motion for an SOJ. *Bradshaw*, 171 Ill. App. 3d at 974-77, 525 N.E.2d at 1101. The facts before us raise no such inference of bias or impropriety, and therefore we would also deny this contention on the merits.

■ Finally we consider defendant's claim that the trial court erroneously took judicial notice of a fact not subject to such notice. In her alibi testimony, defendant's mother testified that when she arrived home at about 10:30 p.m., she began cooking a traditional meal of chitlins, collard greens, macaroni and cheese, sweet potato pies, and cakes. The preparation included cleaning the chitlins, cutting up the greens, preparing a dressing, and preparing the pies and cakes. The mother testified that she completed this cooking between 2 and 2:30 a.m., at which time the defendant was still in the house. The trial judge's comments from the bench in denying the defendant's motion for a new trial cover 22 pages of transcript. While commenting on the credibility of the alibi testimony, the trial judge briefly noted that the defendant's mother would have had to have been a "superhero" in order to shop all day and then perform all the work it would require to prepare such a meal and to keep track of the defendant in the time claimed by the mother. The court found that this and other elements of the alibi testimony did not "ring true" and that the witnesses were lying.

Defendant contends that the trial judge was improperly taking "judicial notice" of the time it takes to prepare such a meal. A trial judge does not operate in a bubble; she may take into account her own life and experience in ruling on the evidence. *People v. Tye*, 141 Ill. 2d 1, 23-24, 565 N.E.2d 931, 942 (1990). Moreover, this was just one part of the trial judge's assessment of the credibility of defendant and his alibi witnesses. She also noted that the defendant's mother testified that the defendant was left at the house at 2 p.m. to babysit, but the defendant testified that he did not arrive at the house until 7 or 8 p.m. The defendant's sister testified that when she returned home the defendant was sitting in the living room listening to music with his ex-girlfriend. The defendant's mother made no mention of the ex-girlfriend and testified that the defendant was watching television

when they arrived home. The court was also skeptical of the witnesses' claims that they were able to drive from Gurnee Mills near Wisconsin to the south side of Chicago in 45 minutes. All of these factors went into the trial judge's evaluation of the alibi testimony. We find no error in her brief allusion to the great effort and time involved in fully preparing the meal in question.

For all of these reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

QUINN, P.J., and GREIMAN, J., concur.