2021 IL App (1st) 192579-U

No. 1-19-2579

Order filed December 30, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 12519 |
| | ) | |
| THOMAS CHRISTENSEN, | ) | Honorable |
| | ) | William H. Hooks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's convictions for two counts of aggravated battery affirmed where the State proved beyond a reasonable doubt that he did not act in self-defense and the trial court did not rely on matters outside the record when finding defendant guilty.

¶ 2    Following a bench trial, defendant Thomas Christensen was convicted of one count each of aggravated battery with a deadly weapon (720 ILCS 5/12-3.05(f)(1) (West 2016)) and aggravated battery causing great bodily harm (720 ILCS 5/12-3.05(a)(1) (West 2016)) and sentenced to three years' imprisonment. On appeal, Christensen contends his convictions should

be reversed because the State failed to prove he did not act in self-defense where the complainant was the initial aggressor and the complainant's testimony was not credible. Christensen also contends he was denied his right to a fair trial because the trial court improperly relied on matters outside the record when finding him guilty. We affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4      Christensen was charged with three counts of aggravated battery—one for committing the offense with a deadly weapon, one for causing the victim great bodily harm, and one for committing the offense while on a public way. Christensen raised the affirmative defense that he acted in self-defense.

¶ 5      At trial, Joseph Seleb testified that on the evening of August 8, 2017, he attended a concert at Northerly Island with his friend, Ian Farnesse. Seleb saw two additional friends at the concert, Carlos Minetti and Joe Mokodanski, whom he knew from working security at a music venue in the South Loop. Prior to the final band's performance, Seleb and Farnesse walked towards the exit to leave. They stopped briefly and conversed with a group of 7 to 10 people, including Minetti and Mokodanski, who were gathered outside the stage area.

¶ 6      As Seleb and Farnesse approached the exit, Farnesse stopped to purchase food. Christensen walked past Seleb. Seleb had no prior contact with Christensen but knew who he was from information on the internet. Seleb approached Christensen and asked him, "hey, your name is Todd or Tom or something like that, right?" Christensen did not respond verbally, but immediately stabbed Seleb with a knife in his left cheek and the left side of his neck. Christensen rapidly swung

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

the knife at Seleb 7 to 10 times. Seleb raised his forearms in front of his face to block Christensen from stabbing him again. The arm of Seleb's denim jacket was cut. Seleb was in shock and his face was "bleeding very severely."

¶ 7 Christensen ran towards the stage area. Seleb paused momentarily, then chased after Christensen. As Christensen ran, he bumped into a woman who was also injured by the knife. Seleb observed Minetti and Mokodanski near the stage. Seleb yelled to Minetti to stop Christensen because Christensen had stabbed him with a knife. Minetti ran towards Christensen and tackled him to the ground against a fence. Seleb ran up to Christensen and kicked him three times in his ribs because he was angry Christensen had tried to take his life. Someone grabbed Seleb and security personnel intervened and separated the men.

¶ 8 Seleb was transported to Northwestern Hospital via ambulance. In court, Seleb identified a photograph of him inside the ambulance with an EMT treating him. The photograph depicted blood covering Seleb's face and neck, and bandages on his left cheek and the left side of his neck. Seleb also identified a photograph of his denim jacket which depicted a cut in the right sleeve in the forearm area. The cut was not there prior to Seleb's altercation with Christensen.

¶ 9 In court, Seleb identified an item inside a box as "[a] switchblade." Defense counsel objected to "the characterization." The trial court replied:

> "The Court will be able to look at the object himself. The objection is overruled. The nomenclature of the weapon, I'm not going to take into consideration what he says. If I admit it, I will get a chance to see it myself. I think I'll be able to discern what it is."

Seleb identified the item as the knife Christensen used to stab him.

¶ 10    Seleb received five stitches in his cheek and two in his neck. He also sustained two fractures in his cheek and jaw. Seleb suffered lingering effects from the injuries. His cheek was constantly numb and tingling. When he ate, the fractures caused clicking noises. Scarring remained on his cheek and neck. Seleb was six feet two inches tall and weighed 180 pounds.

¶ 11    On cross-examination, Seleb acknowledged that on the date of the offense, he was employed as a bouncer at a bar, which was a physically demanding job that required him to use his size and strength to break up fights. On the night of the offense, Seleb drank three or four beers at the venue over a two-hour period. Two hours prior to going to the concert, he had smoked some marijuana. He denied being drunk or "stoned" at the concert. Seleb denied he told police at the scene that he previously fought with Christensen. He also denied telling detectives that he told Christensen he wanted to talk to him, or that Christensen said "no, no, no" when Seleb asked if his name was Todd or Tom.

¶ 12    Seleb denied hitting Christensen in the face before Christensen drew the knife from his pocket. Seleb also denied that Christensen told him to "back the f*** up" when Christensen displayed the knife. When Seleb held his forearms up in front of his face, his hands were in fists above his head. During the offense, Seleb tried to grab Christensen's hand that held the knife. Christensen made "several slashings" at him, and Seleb blocked the punches and swings of the knife. Seleb denied telling detectives his arms were down by his side until he tried to grab Christensen's arms. After the stabbing, Seleb chased Christensen alone. Farnesse did not chase Christensen. None of Seleb's friends hit or kicked Christensen. Seleb denied telling Christensen, "that's what you get" when they were inside the medical tent at the venue. He also denied telling detectives two days after the offense that Christensen was a "f*** piece of s***."

¶ 13    On redirect examination, Seleb testified that Christensen's face was "probably on the ground" while he was being held down. When he initially approached Christensen, Seleb's intent was to inform him that he had been blacklisted at several Chicago-area nightclubs, including the club where Seleb worked.

¶ 14    Carlos Minetti testified that on August 8, 2017, he and Mokodanski attended a concert at Northerly Island. At some point that evening, they were standing near the backstage area speaking with Seleb for about five minutes. Minetti worked security at various music venues and knew Seleb from meeting him at the venues. Minetti observed Seleb approach Christensen and engage him in conversation. The two men appeared to be having a "regular" conversation. Minetti looked away for a few minutes, then heard a commotion that sounded like people fighting. About 10 to 15 feet away from him, he observed Seleb and Christensen engaged in a scuffle, swinging their fists at each other. They were trying to hit each other, but Minetti did not see either man land any punches.

¶ 15    Minetti observed a shiny object in Christensen's hand. About 15 seconds later, Christensen ran towards Minetti holding a bloody knife. Seleb said, "hey, he's got a knife." Minetti approached Christensen and pushed him backwards. He then grabbed Christensen and threw him against a fence. The men fell to the ground and Minetti laid on top of Christensen with Christensen's face on the ground. Minetti did not know which side of Christensen's face struck the fence or the ground. Minetti grabbed Christensen's hand and tried to remove the knife from it. Another person stepped on Christensen's hand trying to get the knife loose. Minetti realized Christensen was not going to release the knife, and falsely told Christensen he was security. Christensen eventually

released the knife. Christensen complained that his ribs hurt. Minetti stood and lifted Christensen from the ground by his arm. Minetti held Christensen against the fence until security arrived.

¶ 16    On cross-examination, Minetti testified that Seleb was alone when he saw him at the concert. After they spoke for five minutes, Seleb walked away. Minetti acknowledged he may have told a detective that Seleb walked away to buy a beer. He assumed Seleb went to get a drink and was going to return to where they were standing. Minetti did not recall telling a detective that Seleb and Christensen were "barking" at each other. After throwing punches at each other, Christensen turned and ran from Seleb. Minetti did not see Seleb chase Christensen. Seleb remained standing where he had been stabbed and yelled to Minetti, "he has a knife." Minetti did not observe Seleb or anyone else kick Christensen. Christensen released the knife after someone stepped on his hand.

¶ 17    Joseph Mokodanski testified he attended the concert at Northerly Island with Minetti. While standing near the VIP area, Mokodanski observed Christensen running out of a crowd of people, holding a knife in his hand. Minetti grabbed Christensen and tackled him to the ground. Mokodanski did not observe anything that occurred with Christensen prior to that moment. Mokodanski was friends with Seleb and saw him two or three times a year at concerts. He saw Seleb at the concert that night, but never saw him engaged in an altercation with Christensen.

¶ 18    On cross-examination, Mokodanski testified that he did not recall speaking with Seleb at the concert. He spoke with detectives a week or two after the incident. Mokodanski did not recall telling detectives he was with Seleb at some point that night, or that Seleb left to buy a beer. Nor did he recall telling detectives that he saw Seleb boxing with someone. Mokodanski saw Seleb chasing Christensen while Christensen ran with the knife. He did not see Seleb after Minetti tackled Christensen. Nor did he see Seleb punch or kick Christensen.

¶ 19    Marcelino Cervantes testified he was working as a security officer at Northerly Island on the night of the incident. Shortly after 9 p.m., Cervantes responded to a radio call regarding an emergency at one of the gates. When he arrived at that gate, someone was already detained. Another person pointed out a knife to Cervantes. Cervantes recovered the knife and subsequently gave it to a Chicago police officer.

¶ 20    Chicago police sergeant Charles Dougherty testified that he was working at the concert at Northerly Island on the night of the incident. About 9 p.m., security personnel pointed out a fight occurring near the entrance of the venue. Dougherty went to the medical tent inside the venue and observed Christensen and Seleb. After Dougherty spoke with Seleb, Christensen was arrested. A security officer at the venue gave Dougherty a silver knife that was recovered from Christensen.

¶ 21    On cross-examination, Dougherty testified that Seleb told him he recognized Christensen from a prior altercation the two of them had at another venue. Dougherty did not hear Seleb tell Christensen "that's what you get."

¶ 22    The State presented a stipulation that Seleb was treated at Northwestern Memorial Hospital on the night of the offense. Donald Robinson Cantrell, a radiologist at Northwestern, would testify that Seleb had a penetrating injury to the left side of his face involving his muscles and gland. Seleb also suffered a comminuted fracture, which is a break or splinter of the bone into two or more fragments, of the base of his left mandibular coronoid process with medial displacement of multiple fracture fragments. Seleb had a second penetrating injury to his left neck with foci of air and surrounding his left sternocleidomastoid muscle and left internal jugular vein. Toxicology reports indicated Seleb's blood was positive for cannabinoids and his blood-alcohol content was .078. Seleb told hospital personnel that he did not smoke cigarettes. The State presented a second

stipulation that Christensen was treated in the emergency room of St. Bernard Hospital on August 9, 2017, and an x-ray indicated he had a fractured rib.

¶ 23    Christensen moved for a directed finding. The trial court granted the motion as to the count of aggravated battery on a public way, finding the State had not provided evidence that the offense occurred on a public way. The trial court denied the motion as to the two remaining counts.

¶ 24    The defense called Chicago police detective Joseph Slomka, who testified that he interviewed Minetti within 24 hours of the incident. Minetti told Slomka that Christensen and Seleb were "barking at each other" and that he observed the men boxing. Mokodanski told Slomka that he was at the concert with Minetti and Seleb, Seleb left the group to buy a beer, and he observed Seleb boxing with another person. Slomka interviewed Seleb in the hospital emergency room just before midnight on the night of the incident. Seleb told Slomka he was smoking a cigarette with some friends when he decided to leave. Seleb denied punching Christensen. Seleb said he initially approached Christensen to tell him he was not welcome in the Chicago punk rock scene. Seleb asked Christensen if his name was Todd, and Christensen replied, "[n]o, no, no." Seleb again asked Christensen if his name was Todd and said they "needed to have some words." Seleb told Slomka that he grabbed at Christensen's arms to stop Christensen from stabbing him. Seleb did not say that his fists were raised above his head or that his head was between his forearms. Seleb said his hands were at his side when Christensen attacked him. Seleb referred to Christensen as "a f*** piece of s***." Slomka observed an abrasion to the left side of Christensen's face. Christensen was transported from the police station to St. Bernard Hospital for treatment.

¶ 25    Christensen testified that he attended the concert at Northerly Island with his girlfriend. During a break between bands, Christensen walked to the restroom and vending area. A man he did not know broke away from a group of people and walked quickly towards him with his hands in fists. Christensen later learned the man was Seleb. Seleb told Christensen, "[y]our name is Todd or your name is Tom. I know who you are." Christensen replied, "I don't know who you are, that's not me, I don't know you," and continued walking. Seleb's tone was aggressive, loud, and quick. Seleb was about one foot from Christensen and followed him for about 30 feet saying, "I need to talk to you." Seleb stopped walking and Christensen continued walking to the restroom. Christensen was frightened. Seleb was taller and appeared to weigh more than Christensen.

¶ 26    After exiting the restroom, Christensen took a different path to return to the stage area because he feared Seleb would confront him again. Seleb again broke away from his group of friends and aggressively marched towards Christensen. Seleb followed Christensen for about five feet saying, "I f*** know you, I need to f*** talk to you." Christensen was "very frightened" and believed Seleb was under the influence of drugs or alcohol. Christensen turned around and told Seleb, "I don't know you, I don't know who you are." Seleb punched Christensen on the left side of his face below his lip. In court, Christensen identified a photograph of himself taken during processing at the jail which indicated a large bruise and abrasion on the left side of his lip. Christensen testified that the abrasion was caused by Seleb punching him.

¶ 27    Christensen testified he felt "very scared and threatened" that Seleb was going to attack him. Seleb's group of friends was about 10 feet behind Seleb and began approaching Seleb and Christensen. Christensen turned around and walked quickly towards the stage where he previously

observed security personnel. Christensen saw Seleb and his friends following him and feared he was going to be attacked and beaten.

¶ 28    Christensen removed a pocketknife from his pocket, opened it, and told Seleb to "back the f*** up." Seleb lunged at Christensen with a closed fist raised near his shoulder. Christensen believed Seleb was going to punch him a second time. Christensen stabbed Seleb to stop him. Christensen then "trotted quickly away." Christensen turned around and saw Seleb pursuing him. Seleb again raised his fist to strike Christensen. Christensen again stabbed Seleb to stop him. Christensen was then shoved to the ground from behind. While on the ground, Christensen was kicked, stomped on, and punched. He was not punched or kicked in the face while on the ground. Christensen was arrested. While being treated near the medical tent, Seleb said to Christensen, "that's what you get." At the time of the incident, Christensen was 5 feet 10 inches tall and weighed a little less than 145 pounds. He carried the pocketknife with him daily as a tool.

¶ 29    On cross-examination, Christensen testified he carried the knife with him occasionally, three or four days a week, randomly when it was with his keys. He carried the knife to open boxes and cut ropes. He previously brought the knife to other concert venues. Christensen did not know whether Northerly Island allowed patrons to bring knives into the venue. Christensen did not look for security personnel when he initially exited the restroom but did so after Seleb began following him. Christensen admitted he stabbed Seleb twice. Prior to the stabbing, Seleb's friends did not strike, threaten, or say anything to Christensen. Seleb did not attack Christensen with a weapon and Christensen did not see a weapon in Seleb's hand. Seleb punched Christensen once prior to the stabbing. Seleb did not make physical contact with Christensen a second time.

¶ 30    The trial court reviewed all the testimony and exhibits in detail. The court found that Seleb and Christensen had similar physical builds and any differences in height and weight were insignificant. The court found that Seleb and Christensen became engaged in "a sophomoric, unprofessional, little damage back and forth boxing match, which does not even raise to the level of a boxing match you see at a play background involving grade school kids." The court stated that neither man could significantly harm the other by punching him. Consequently, the court found that what occurred prior to the stabbing was insignificant.

¶ 31    The court found Seleb's testimony that there was an altercation with words exchanged was "largely credible." It further found that Seleb's low levels of beer and marijuana combined with immaturity started "this back and forth." The court found, however, that the evidence clearly showed that Seleb posed no threat of serious bodily harm to Christensen and made no death threats. Nor did any people with Seleb make any threats or agree to participate in an attack on Christensen.

¶ 32    The court found that the defense established the abrasion did not occur when Christensen was tackled to the ground. However, there was disputed evidence as to what occurred during the purported "boxing match back and forth" between Christensen and Seleb. The court found the abrasion on Christensen's lip was "an insignificant mark." The court did not know how or when the mark appeared. The court concluded the abrasion had "nothing to do with how a rational and reasonable individual would react, even if he suffered it with a weak blow from an adversary." The court found Christensen's reaction when confronted by the "rather immature, sophomoric victim" was "disproportionate" and "over the top."

¶ 33   The court further stated that, regardless of the verdict, Christensen "won" in this case because the stabbings were "death blows" and this did not become a murder case. The court characterized the knife as a "folded dagger." The court explained:

"[t]his is not your average folded knife. This knife measures – this dagger measures approximately three inch [*sic*] in its blade portion. If you look at the totality of the weapon, it's eight inches in length. The blade and the handle for the blade are unusual, in the sense that they are – they match. The connecting between – the connection between the blade and the handle is such that there is no blade guard that keeps the blade from going all the way in with the handle.

So this seven-inch-long blade is really eight inches in length, because this blade can actually go in, and it's the same size – the handle is the same size as the blade. So if inserted or punched into a body or a watermelon or anything soft, gel, anything soft, a neck, a face, it can actually go in as far as necessary because it has complete continuity between the shape of the blade and the shape of the handle. There is no evidence as to how far this blade went into the victim's body."

¶ 34   The court found that Seleb suffered severe penetrating injuries to his face and neck that were "not playful injuries." The court noted Seleb still suffered from some of his injuries. The court further stated it had observed cases involving discharge of a firearm that did not cause as much damage "as this knife in the hands of this defendant."

¶ 35   The court expressly stated it observed Christensen's demeanor when he testified and listened very carefully to his testimony. The court found Christensen's testimony not credible "in

any way whatsoever." It found Christensen's reaction to what had transpired was disproportionate and "almost homicidal," and that Christensen used the knife as a deadly weapon.

¶ 36    The court found there was "some evidence" of self-defense from Christensen's testimony. However, the court stated it did "not find defendant's testimony to be credible." The court concluded "[i]t is clearly not self-defense." The court read the text of the self-defense statute and stated, "[t]his is not that case." Accordingly, the trial court found Christensen guilty of aggravated battery with a deadly weapon and aggravated battery causing great bodily harm.

¶ 37    In his initial and supplemental posttrial motions, Christensen argued, *inter alia*, that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) Seleb's testimony was not credible and was contradicted by other witnesses, (3) Christensen's use of force for self-defense was reasonable, and (4) the trial court improperly relied on matters outside the record to find Christensen guilty, specifically, its own personal experience and its independent examination and measurement of the knife.

¶ 38    At the hearing on Christensen's posttrial motion, the trial court stated that its credibility determinations were proper and, as a whole, Seleb's testimony was compelling and persuasive. The court stated that, even considering the amount of force used in the light most favorable to Christensen, this case "was not even a close call concerning self-defense." No evidence suggested Seleb posed a threat of death or great bodily harm to Christensen, whose acts were excessive. The court stated it had a right to measure the knife when evaluating the evidence. The trial court denied

Christensen's posttrial motions. It then sentenced Christensen to a term of three years' imprisonment for each of the two counts of aggravated battery.[2]

¶ 39                                    II. ANALYSIS

¶ 40    On appeal, Christensen first contends his convictions should be reversed because the State failed to prove he did not act in self-defense, where Seleb was the initial aggressor and Seleb's testimony was not credible. Christensen maintains Seleb punched him first. Christensen claims that because Seleb was 3 inches taller and 35 pounds heavier than him, and with a group of people, Christensen had a reasonable belief that he was in imminent danger of harm. Christensen further argues Seleb's testimony was unbelievable, illogical, inconsistent with his prior statements to police, and was contradicted by the testimony from Minetti and Mokodanski.

¶ 41    The State responds that it proved Christensen did not act in self-defense where the evidence showed Seleb and Christensen were engaged in a simple verbal altercation that did not justify Christensen's use of deadly force. The State argues Seleb was unarmed, did not threaten Christensen, and there was little difference between their physical sizes. The State points out that the trial court found Seleb's testimony credible and Christensen's testimony not credible. It further asserts the testimony from Minetti and Mokodanski was not inconsistent with Seleb's testimony that he was trying to grab the knife and block Christensen from stabbing him again.

---

[2]The mittimus reflects two three-year sentences. Although not specified by the trial court, the prison terms ran concurrently in accordance with the statute providing multiple sentences imposed at the same time "shall run concurrently" unless otherwise determined by the court. 730 ILCS 5/5-8-4 (West 2016). The record indicates that after finding Christensen guilty of the two counts of aggravated battery, the trial court stated it was "interested in the research on the issue of merger." The court stated, "I think both of these offenses merge, but I'm interested in the parties' position." The issue of merger was never raised again. The court did not explicitly merge the counts. At sentencing, it stated, "the sentence in this case is *** three years."

¶ 42    To prove Christensen guilty of aggravated battery with a deadly weapon as charged in this case, the State was required to show that Christensen, in committing a battery, other than by discharge of a firearm, caused bodily harm to Seleb by using a deadly weapon, specifically, a knife. 720 ILCS 5/12-3.05(f)(1) (West 2016). To prove Christensen guilty of aggravated battery causing great bodily harm, the State had to establish that, in committing a battery, Christensen knowingly caused great bodily harm to Seleb by stabbing him about his body. 720 ILCS 5/12-3.05(a)(1) (West 2016). Self-defense is an affirmative defense, and when raised by a defendant, it is the State's burden to prove beyond a reasonable doubt that defendant did not act in self-defense, in addition to proving the elements of the offense. *People v. Gray*, 2017 IL 120958, ¶ 50.

¶ 43    The self-defense statute provides that a person is justified in using force against another when and to the extent he reasonably believes such conduct is necessary to defend himself against the other person's imminent use of unlawful force. 720 ILCS 5/7-1(a) (West 2016). The statute further provides that a person is justified in the use of force that is intended or likely to cause death or great bodily harm only if he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself or another. *Id.*

¶ 44    When a defendant claims he acted in self-defense, he must present some evidence of each of the following elements: (1) unlawful force was threatened against a person; (2) the person threatened was not the aggressor; (3) there was an imminent danger of harm; (4) his use of force was necessary; (5) he actually and subjectively believed a danger existed that required the force applied; and (6) his beliefs were objectively reasonable. *Gray*, 2017 IL 120958, ¶ 50; *People v. Lee*, 213 Ill. 2d 218, 225 (2004). "If a defendant presents 'some evidence as to each of these elements,' the burden shifts to the State to disprove the defense beyond a reasonable doubt."

*People v. Bennett*, 2017 IL App (1st) 151619, ¶ 33. If the State negates any one of these elements, defendant's claim of self-defense must fail. *Gray*, 2017 IL 120958, ¶ 50; *Lee*, 213 Ill. 2d at 225.

¶ 45    On review, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense. *Gray*, 2017 IL 120958, ¶ 51. Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing all reasonable inferences from therein. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 46    The testimony of a single witness is sufficient to sustain a conviction where it is positive and credible, even when it is contradicted by the defendant. *Gray*, 2017 IL 120958, ¶ 36. A conviction will not be reversed simply because the evidence was contradictory, or a defendant claims a witness was not credible. *Id.* "[C]ontradictory testimony does not necessarily destroy the credibility of a witness[.]" *Id.* ¶ 47. It is the duty of the factfinder to determine if and when the witness testified truthfully, and whether flaws in part of the testimony affected the credibility of the whole testimony. *Id.*

¶ 47    Here, viewed in the light most favorable to the State, we find the evidence supported the trial court's finding that Christensen did not act in self-defense. Seleb testified he approached Christensen and asked if his name was Todd or Tom. Christensen immediately struck Seleb with a knife in his left cheek and the left side of his neck. Seleb said Christensen rapidly swung the knife at him 7 to 10 times. Seleb raised his forearms in front of his face, with his hands in fists above his head, trying to block Christensen from stabbing him again. A photograph depicted a cut

in the forearm of Seleb's denim jacket, corroborating his testimony. Seleb also tried to grab Christensen's hand that held the knife. After the stabbing, Christensen ran and Seleb chased after him. Seleb yelled at Minetti to stop Christensen because Christensen had stabbed him with a knife. Minetti tackled Christensen to the ground. A photograph depicted Seleb inside an ambulance with blood covering his face and neck and bandages on his left cheek and the left side of his neck. The State presented a stipulation that Seleb suffered penetrating injuries to the left side of his face and neck. The facial stabbing damaged Seleb's muscles and gland and splintered a bone into fragments. The stabbing to his neck was near his muscles and jugular vein.

¶ 48    In addition to Seleb's testimony, Minetti testified he observed Seleb approach Christensen and engage him in a "regular" conversation. Minutes later, Minetti observed Seleb and Christensen swinging their fists at each other. Minetti observed a shiny object in Christensen's hand. Christensen then ran towards Minetti holding a bloody knife. Minetti threw Christensen against a fence and held him on the ground. He tried to remove the knife from Christensen's hand, but Christensen would not release it until someone stepped on his hand. Mokodanski also testified he observed Christensen running out of a crowd of people holding a knife in his hand with Seleb chasing after him.

¶ 49    The trial court expressly found that Seleb's testimony was "largely credible," and Christensen's testimony was not credible "in any way whatsoever." The court found the men had similar physical builds and any differences in height and weight were insignificant. It further found the men became engaged in a sophomoric boxing match. The court found neither man was capable of significantly harming the other by punching him, and therefore, any fight that occurred prior to the stabbing was insignificant. The court found the evidence clearly showed that Seleb posed no

threat of serious bodily harm to Christensen. He made no death threats, nor did anyone with him make any threats or agree to participate in an attack on Christensen. The court did not know how the abrasion on Christensen's face occurred, but determined it had "nothing to do with how a rational and reasonable individual would react, even if he suffered it with a weak blow from an adversary." The court concluded, based on what had transpired, that Christensen's reaction of stabbing Seleb with the knife was "disproportionate," "over the top," and "almost homicidal." The court specifically stated Christensen's actions were "clearly not self-defense."

¶ 50    In addition, when denying Christensen's posttrial motion, the court stated Seleb's testimony was compelling and persuasive. It stated that no evidence suggested Seleb posed a threat of death or great bodily harm to Christensen, whose acts were excessive. The court again concluded this case "was not even a close call concerning self-defense."

¶ 51    The record therefore reveals that the trial court found the State's evidence established that (1) Seleb did not threaten unlawful force against Christensen, (2) Christensen was not in danger of imminent harm from Seleb, (3) Christensen's use of force against Seleb was not necessary, (4) Christensen did not actually and subjectively believe a danger existed that required the force he applied, and (5) Christensen's alleged belief that he was facing harm from Seleb was not objectively reasonable. *Gray*, 2017 IL 120958, ¶ 50. By negating all the elements, the State proved beyond a reasonable doubt that Christensen did not act in self-defense.

¶ 52    In reaching this conclusion, we find no merit in Christensen's argument that his testimony regarding his version of the events was credible and supported by the evidence while Seleb's testimony was contradicted and impeached. The trial court specifically stated it observed Christensen's demeanor when he testified and listened very carefully to his testimony. The

determination of the credibility of Christensen's testimony and the resolution of any conflicts in the evidence was within the province of the trial court, which expressly found Christensen's testimony not credible "in any way whatsoever." *Siguenza-Brito*, 235 Ill. 2d at 228. Moreover, the record shows that, contrary to Seleb's testimony, the court found Christensen and Seleb were engaged in a sophomoric, unprofessional boxing match. The court further found, however, that even if Seleb punched Christensen as Christensen claimed, Christensen's reaction was disproportionate and excessive. It was the trial court's duty to determine how any contradictions affected the credibility of each witnesses' testimony. *Gray*, 2017 IL 120958, ¶ 47. Based on this record, we find no reason to disturb the trial court's credibility determinations. *Id.* ¶ 36.

¶ 53    Christensen next contends he was denied his right to a fair trial because the trial court improperly relied on matters outside the record when finding him guilty. Christensen asserts the court relied on its own personal experiences and its examination of the knife, which affected its credibility determinations and led the court to reject his claim of self-defense.

¶ 54    The State responds that Christensen was not denied a fair trial by the trial court's "stray" comments where the record shows the court relied solely on the admitted evidence in reaching its verdict and did not substitute its personal experience for the evidence. The State points out it was undisputed at trial that Christensen stabbed Seleb in the face and neck with a knife, and the only question before the court was whether Christensen had acted in self-defense.

¶ 55    It is presumed that when a trial court sits as the trier of fact, it considers only competent admissible evidence in making its findings. *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). This presumption may be rebutted only where the record affirmatively shows the contrary. *Id.* at 603-04. The trial court's deliberations are limited to the record, and any determination based upon a

private investigation or private knowledge of the court, untested by cross-examination or the rules of evidence, constitutes a denial of due process. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 28. Whether Christensen was denied his right to due process is a question of law which we review *de novo*. *Id.* ¶ 36.

¶ 56    " 'A trial judge does not operate in a bubble; [he] may take into account [his] own life and experience in ruling on the evidence.' " *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 64 (quoting *People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007)). Reversal is only required when the trial court's reliance on matters outside the record has prejudiced one of the parties. *Id.* Therefore, reliance on information outside the record does not constitute reversible error where there is no evidence it either misled or influenced the trial court's judgment. *Id.* As stated above, in a bench trial, the trial court is responsible for weighing and drawing reasonable inferences from the evidence, in addition to resolving any conflicts in the evidence and determining the credibility of the witnesses. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 57    Here, Christensen raises four challenges to remarks made by the trial court during its lengthy and detailed review of the evidence. When considered in context, we find no merit to any of these challenges.

¶ 58    First, Christensen claims the court improperly relied on its personal experience as a public-school student in Chicago when it found Seleb's punch and the events prior to the stabbing were insignificant because they were nothing more than a playground fight. The record, however, indicates the trial court initially found that Christensen and Seleb had similar physical builds, that any differences in their height and weight were insignificant, and that neither man was capable of significantly harming the other by punching him. On that basis, the court determined the

"sophomoric, unprofessional, little damage back and forth boxing match, which [did] not even raise to the level of a boxing match you see at a play background involving grade school kids" was insignificant. Thereafter, the court remarked, "having gone to grade school – public grade school and high schools in the Chicagoland area, this is the stuff of playgrounds every day around this town, unfortunately. But it's stuff that people walk away from and nobody is scared of anyone." The court further commented that "foolishness occurs" at places such as Soldier Field when people have been drinking alcohol or smoking marijuana. The court then concluded, "[t]o this Court, it's a no big deal situation as it relates to the so-called threat that was occasioned between these two grown men."

¶ 59     The record thus reveals the trial court was analyzing Christensen's assertion that the alleged single punch and attempted additional punches from Seleb gave Christensen a reasonable belief that he was in imminent danger of harm that justified his stabbing of Seleb. Based on the court's assessment of the evidence presented, it concluded Christensen's assertion was not credible. The court found Seleb posed no threat of serious bodily harm to Christensen. When read in context, the record shows the trial court merely made a brief remark that it had attended public school and analogized the fight between Christensen and Seleb to an insignificant, childish playground fight. There is no indication the trial court based its finding on its own personal experience. *Pellegrini*, 2019 IL App (3d) 170827, ¶ 64. Instead, the court was engaged in its duty of weighing the evidence, making inferences from the evidence, and determining the credibility of the witnesses. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 60    Second, Christensen argues the court improperly relied on its personal experience in the United States Marines when it stated that Christensen's injury was not a "busted lip." In the challenged remark, the court stated:

"[t]here is evidence *** that shows a mark on the mouth of the defendant that appears to be – I won't characterize it as a busted lip, because in training in the Marine Corps I had busted lips and the lip was actually busted. This was a – simply a little blood mark on the defendant's lower lip that looked like it could come from being punched, somebody's teeth."

¶ 61    Significantly, there was never an issue in this case as to whether Christensen had sustained a "busted lip." No one, including Christensen, asserted he had. The trial court made this comment when reviewing the evidence, which included a photograph of Christensen with an abrasion below his lower lip. Read in context, the record shows the court expressly stated it was attempting to "characterize" or describe Christensen's injury as depicted in the photograph. The court concluded the abrasion had "nothing to do with how a rational and reasonable individual would react, even if he suffered it with a weak blow from an adversary." The record thereby shows the court assessed the evidence presented and concluded that Christensen's injury was not the type that would give a person a reasonable belief that stabbing someone in the face and neck was a rational reaction. The court merely remarked it had sustained "busted lips" while serving in the Marines. It did not base any of its findings on its personal experience in the Marines.

¶ 62    Third, Christensen contends the court improperly relied on its private knowledge and conjecture when it determined the stabbing was "very professionally done." Read in context, the court stated that the penetrating injuries Christensen inflicted upon Seleb:

"were done with such precision and such speed and such force that this Court – there's no evidence otherwise. There's no evidence either way but this was not a typical response, in terms of the precision in which these blows were delivered. I would say there's no evidence that this blow by this defendant, to this victim was an amateur blow. It was very professionally done."

Christensen asserts there was no evidence to support the court's conclusion that the stabbing was done with "precision," "speed," and "force."

¶ 63     The record shows the trial court made these remarks when it was discussing the severity of Seleb's stab wounds. The court reviewed the details from the stipulation regarding the radiologist's findings and stated the severe penetrating injuries to Seleb's face and neck were "not playful injuries." Seleb had testified that after he asked Christensen if his name was Todd or Tom, Christensen "immediately" struck him in his cheek and neck with a knife. Seleb testified Christensen "would not stop swinging the knife" and made "several slashings" at him. Seleb further stated Christensen "easily" swung the knife at him 7 to 10 times, and that it was "very rapid." Accordingly, when considered in context, the record shows the court's remarks were not based on matters outside the record, but instead, were reasonable inferences it drew from the evidence presented, which was within the province of the trial court. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 64     Finally, Christensen asserts the court erred when it privately measured the knife and made technical conclusions about the capabilities of the knife based on its independent investigation. Christensen concedes the length of the knife was not an element of the offense in this case. He

asserts, however, that the trial court found the size and capabilities of the knife relevant to its analysis and rejection of his self-defense claim.

¶ 65    The record shows that the characterization of the knife initially arose during Seleb's testimony when he identified the knife in court as "[a] switchblade." Defense counsel objected to that characterization. The court replied it would not consider Seleb's description of the knife, and instead, would "look at the object himself." The court stated, "[i]if I admit it, I will get a chance to see it myself. I think I'll be able to discern what it is."

¶ 66    Subsequently, when rendering its findings, the court characterized the knife as a "folded dagger." The court further stated, "[t]his is not your average folded knife." The court stated the blade was "approximately" three inches long, and the total length of the weapon was eight inches. It then stated the blade and handle of this specific knife were "unusual" because there was no blade guard where the blade connected to the handle. Consequently, there was nothing to stop the knife from being inserted entirely with its handle. The court then remarked, "[t]here is no evidence as to how far this blade went into the victim's body."

¶ 67    The record thus shows the trial court thoroughly examined the knife, which had been admitted into evidence, to determine its characterization. There is no indication in the record that the court's rejection of Christensen's self-defense claim was based in any part on its analysis of the size and technical capabilities of the knife. *Pellegrini*, 2019 IL App (3d) 170827, ¶ 64. The court found Christensen's testimony that he acted in self-defense was not credible and concluded that his act of stabbing Seleb was "clearly not self-defense." In denying Christensen's posttrial motion, which had raised the above challenge, the court expressly stated this case "was not even a

close call concerning self-defense," and that there was no evidence suggesting Seleb posed a threat of death or great bodily harm to Christensen, whose acts were excessive.

¶ 68    We therefore conclude the record clearly establishes that the trial court's rejection of Christensen's claim of self-defense was solely based on the evidence presented and was not based on its consideration of any matters outside the record.

¶ 69                                III. CONCLUSION

¶ 70    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 71    Affirmed.