2021 IL App (2d) 200469-U
No. 2-20-0469
Order filed December 20, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-327 |
| GREGORY L. EVANS, | ) ) ) | Honorable C. Robert Tobin III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Bridges and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant was proved guilty of robbery despite the victim's admitted lies to the police about how she met up with defendant, her former boyfriend, on the night of the robbery. Her fabrication on that point did not require the trial court to reject her account of the robbery itself. Also, the trial court's admission of defendant's 2013 conviction of domestic battery against the victim was not plain error where the evidence was not closely balanced and the claimed error was not structural.

¶ 2    Defendant, Gregory L. Evans, was charged with a single count of robbery (720 ILCS 5/18-1(a) (West 2018)), two counts of criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2018)), and two counts of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)). The alleged victim was C.W. Following a bench trial, defendant was convicted of robbery and acquitted of the

remaining charges. He was sentenced to a seven-year prison term. On appeal, defendant contends that the State failed to prove his guilt beyond a reasonable doubt and that the trial court committed plain error by allowing evidence of his prior conviction of domestic battery against C.W. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Before trial, the State filed a motion *in limine* seeking to admit evidence of (1) defendant's 2013 conviction of domestic battery against C.W., and (2) C.W.'s allegations, in police interviews, of other violent acts against her when she dated defendant from 2012 to 2016. The State offered the evidence to show defendant's propensity to commit acts of domestic violence. The prosecutor added, "[T]he past history between the defendant and the victim in this case also goes to the state of mind of the victim as to her fears at the time this was going on." The trial court granted the State's motion.

¶ 5        At the bench trial, C.W. testified that she lived in Rockford. C.W. met defendant in 2012, and they had a turbulent relationship that ended in March 2016. They lived together on and off during the relationship. C.W. testified that she had no contact with defendant between March 2016 and the end of 2019. At some point, she communicated with defendant as a Facebook friend. By that time, C.W. had a fiancé. She arranged to meet defendant on December 2, 2019, in Belvidere. C.W. drove to Belvidere and met with defendant at a parking lot for about 20 minutes. Defendant wanted her to go with him to a room he rented from a friend, but C.W. did not want to go.

¶ 6        C.W. drove to Belvidere again on December 5, 2019. She went to see her father and to collect rent on a rental property that she owned. She arranged to visit defendant as a friend. She picked him up at the same parking lot as before and drove him to a 7-Eleven convenience store at about 6:30 or 7 p.m. Defendant did not want to see C.W.'s father (as there was friction between

him and her family), so he waited at the 7-Eleven while C.W. visited her father. C.W. then picked defendant up at the 7-Eleven and they went to collect the rent from her tenant, Ernesto Lopez. When they arrived at the rental property, they got out of the car. They hugged, and defendant kissed C.W.

¶ 7     C.W. met with Lopez inside the screened porch while defendant waited outside. Lopez paid C.W. $700 in $20 bills. After C.W. collected the rent, defendant asked her if she still lived there. C.W. responded that she would not be collecting rent if she still lived at the property. C.W. testified, "I thought, great, he's high or something is going to happen because he seemed really confused."

¶ 8     According to C.W., defendant's demeanor changed as soon as he saw the money. He told her to get in the car. She told him that she would take him back to the parking lot, but he insisted that she drive to a street by his apartment. Defendant instructed her to park behind a white van. They talked about his family for a while. Then defendant started trying to kiss C.W. He put his hands into her blouse. As he touched her breasts, he said, " 'Those are mine.' " [He also put his hand on her pants, over her vagina. C.W. pushed him away and told him to stop. According to C.W., defendant told her to " 'get out of the car and pull down your pants because I'm going to take what's mine.' " When C.W. refused to get out of the car, defendant got angry and said he was going to rob her. Defendant cocked his fist and said, " 'This is going to get physical.' " He said that he would take her purse—"the whole thing"—if she did not give him the money that she had just put in there. Defendant started digging through C.W.'s purse. She told him she would give him the money. In addition to the rent money, there was about $250 in the purse for Christmas shopping. C.W. tried to hide some of the money deeper in her purse. Defendant started to count

the money and said it wasn't all there. Defendant got out of the car with the money and walked away.

¶ 9     C.W. testified that she called the police nonemergency number and then traveled to the police station. When she spoke to the police, she did not tell them that she had arranged to meet with defendant that night. Rather, she falsely claimed that she ran into him by chance in Belvidere. She testified that she did so because she was scared. She was afraid defendant could hurt someone in her family.

¶ 10     C.W. acknowledged that she prepared a written statement at the police station on the night of the incident. She wrote that, when she was collecting the rent money, she turned around and was surprised to see defendant at the door. C.W. also testified that she exchanged text messages with Lopez while at the police station. Lopez wrote that he saw someone arrive with her in her car. In response, C.W. insisted that defendant was not in her car. She stated that she saw someone walking when she got out of the car. Lopez indicated that he had spoken with the police, who asked if the suspect had come with C.W.

¶ 11     C.W. testified that, the next morning, she returned to the police station to clarify that she had, in fact, arranged to meet with defendant on December 5, 2019. She testified that she had lied to the police because she did not want her family to know that she had reconnected with defendant. She claimed that the initial account she gave police was true apart from her assertion that she had met defendant by chance the night before.

¶ 12     On cross-examination, C.W. testified that, on December 10, 2019, she filed a petition for an order of protection against defendant. The petition stated that, on December 5, 2019, defendant saw her leaving her rental property and asked her for a ride. They talked about their past as she drove to the other side of town. When she stopped the car to drop defendant off, he tried to kiss

her several times, and she pushed him away. Defendant got angry and started grabbing her breasts and saying, " 'These are mine.' " He also tried to touch her vagina over her pants and said, " 'This pussy is mine.' " Defendant said that he was going to rape and rob C.W. He told her that she had a choice: she could give him her money or her purse. When she objected, he cocked back his hand and said, " 'This is going to get physical! I almost killed you before.' "

¶ 13    Detective Thomas Delevan of the Belvidere Police Department testified that he spoke with defendant at about 11:00 p.m. on December 5, 2019. Defendant said that he worked for a company called Stratosphere and had finished that night between 8 and 11 p.m. He took a Zippy Cab from work. He denied having any recent contact with C.W. Delevan advised defendant that he had been in touch with Zippy Cab's only driver that night, Tom Gough. Gough indicated that he had not picked up defendant. Defendant told Delevan that he had been picked up by another driver. After interviewing defendant, Delevan placed him under arrest. Kyle Koelker, a corrections officer, was present when defendant was searched as part of the intake process at the Boone County jail. Koelker testified that cash was hidden near defendant's buttocks underneath his clothing. The record reflects that $265 was recovered from defendant, consisting of 13 $20 bills and a single $5 bill.

¶ 14    The parties stipulated that (1) a representative of Stratosphere would testify that defendant's last day of work at Stratosphere was November 25, 2019, (2) a driver for Zippy Cab would testify that he gave defendant a ride at about 4 p.m. on December 5, 2019, and (3) fingerprints matching defendant's were found on a billing statement contained in C.W.'s purse.

¶ 15    The trial court found defendant guilty of robbery but not guilty of the remaining charges. As to the robbery charge, the trial court found:

"[C.W.] says he threatened her. Based upon [their] past relationship, the fact that he has committed a domestic battery against her is enough that even a threat of violence towards her is probably enough for her to reasonably fear further violence and meets the threat of imminent use of force."

¶ 16 The trial court observed that C.W. was inconsistent, but only as to "what happened before getting to [Lopez's] place." The trial court found that the inconsistency did not damage C.W.s credibility, as it was understandable that she might have been embarrassed to admit that she had willingly met with defendant. On the other hand, the trial court found that defendant's false exculpatory statements to police were evidence of consciousness of guilt.

¶ 17                                    II. ANALYSIS

¶ 18 Defendant initially argues that the State failed to prove his guilt beyond a reasonable doubt. Our review of this contention is governed by the following principles:

"When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. [Citation.] The critical inquiry is whether the evidence could reasonably support a guilty finding, regardless of whether the evidence is direct or circumstantial. [Citation.] The fact finder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. [Citation.] 'Because the trier of fact is best positioned to judge the credibility of the witnesses and resolve disputes in the evidence, its decision is entitled to great deference.' [Citation.] We will reverse the defendant's conviction only where the evidence is so unreasonable,

improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. [Citation.]" *People v. Hubbell*, 2021 IL App (2d) 190442, ¶ 14.

¶ 19    Defendant argues that C.W was not a credible witness because she lied to the police and to Lopez about how she first encountered defendant on December 5, 2019.  Although the trial court recognized that C.W. had been untruthful in that regard, the trial court found her testimony about the robbery credible.  "[A] reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Delhaye*, 2021 IL App (2d) 190271, ¶ 75.  We cannot say the trial court erred in crediting C.W. testimony about the robbery.  The trial court reasoned that C.W. was embarrassed to admit that she had arranged to see defendant.  This was a reasonable inference given her admittedly turbulent past with defendant, her family's negative feelings toward him, and her having a fiancé. The trial court was not obliged to discredit the rest of her testimony.

¶ 20    Defendant complains that the trial court treated his lies to the police differently than C.W.'s lies.  Defendant falsely told the police that he had no recent contact with C.W., had been working on the night of the incident, and had left work by cab between 8 and 11 p.m.  The trial court regarded defendant's false exculpatory statements as evidence of consciousness of guilt.  See *People v. McQueen*, 115 Ill. App. 3d 833, 837 (1983).  Defendant asks why the trial court did not attribute defendant's lies to embarrassment or fear of reprisals from his girlfriend.  Defendant also contends that the trial court placed undue weight on the fact that $265 was found near his buttocks underneath his clothing.  Defendant notes that $265 was less cash than C.W. reported having in her purse.  He also argues that the trial court essentially attributed—unfairly—a criminal mindset to anyone who keeps money in his or her "waistband."  These arguments are meritless.  The choice of what weight to assign the evidence and what inferences to draw therefrom belong to the trier of

fact, and we will not substitute our judgment in these matters. Notwithstanding possible tension with his girlfriend, it is entirely reasonable to infer that defendant's false exculpatory statements were evidence of consciousness of guilt. Furthermore, it is certainly unusual to keep cash under one's clothing and near the buttocks, as defendant did. The trial court reasonably inferred that defendant was concealing the proceeds of the robbery, even though the amount found on him was less than C.W. had in her purse. We therefore conclude that the evidence was sufficient to sustain defendant's conviction of robbery.

¶ 21 Defendant next argues that the trial court erred in admitting his 2013 conviction of domestic battery against C.W. Notably, defendant does not challenge the admission of C.W.'s allegations, in police interviews, of defendant's other violent acts against her while they were dating.

¶ 22 "Evidence that a defendant has committed crimes other than the one for which he is on trial may not be admitted for the purpose of demonstrating his propensity to commit crimes." *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 96; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, "[e]vidence of other crimes is admissible *** if relevant for any purpose other than to show a defendant's propensity to commit crime." *Cerda*, 2021 IL App (1st) 171433, ¶ 96; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Section 115-7.4(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4(a) (West 2018)) provides an exception to the general ban on propensity evidence, allowing the admission, in a domestic violence prosecution, of the defendant's prior acts of domestic violence. Evidence admissible under section 115-7.4(a) "may be considered for its bearing on any matter to which it is relevant" *(id.)* including to show the defendant's propensity (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)). Evidence is inadmissible under section 115-7.4(a) if its probative value is substantially outweighed by the danger of unfair prejudice. *People v. Nixon*,

2016 IL App (2d) 130514, ¶ 36; Ill. S. Ct. R. 403 (eff. Jan. 1, 2011). Section 115-7.4(b) (725 ILCS 5/115-7.4(b) (West 2018)) provides:

"(b) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances."

¶ 23　Defendant argues that his 2013 domestic battery conviction does not meet the criteria of section 115-7.4(b) and should not have been admitted into evidence. He further argues that the trial court, having admitted the conviction to show propensity for domestic violence, exceeded that purpose by considering the conviction as evidence that defendant committed a different offense—robbery—by taking C.W.'s cash through the threat of force. See 720 ILCS 5/18-1(a) (West 2018) ("A person commits robbery when he or she knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force.").

¶ 24　Defendant did not raise these issues in his posttrial motion. "[T]he presence of both a trial objection and a written post-trial motion raising the issue are necessary to preserve an issue for review." *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Accordingly, defendant forfeited the issue. He argues, however, that the issue is reviewable under the plain-error doctrine. As our supreme court has explained:

"The plain-error doctrine does not instruct a reviewing court to consider all forfeited errors. [Citation.] It is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' [Citation.] Rather, it is 'a " 'narrow and limited exception to the general waiver rule' " '

[citation] whose purpose is to protect the rights of the defendant and the integrity and reputation of the judicial process [citation]." *People v. Herron*, 215 Ill. 2d 167, 177 (2005).

¶ 25    The plain error doctrine has recently been described as follows:

"[U]nder the plain-error doctrine, a reviewing court may consider an unpreserved error if (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Birge*, 2021 IL 125644, ¶ 24.

¶ 26    The first prong of plain error is not met, because the evidence is not closely balanced. Although C.W. was impeached with prior inconsistent statements about how she met up with defendant on the night in question, the trial court reasonably found her testimony otherwise credible concerning the robbery.   Likewise reasonable was the trial court's conclusion that defendant's false exculpatory statements to the police were evidence of consciousness of guilt.  As noted, the presence of cash hidden in defendant's clothing gave rise to the inference that the cash was part of the robbery proceeds.   Finally, defendant's fingerprints were found on a billing statement in C.W.'s purse.

¶ 27    Nor does this case meet the second prong of the plain-error doctrine.  Second prong plain-error has been equated with "structural error."  *People v Bever*, 2019 IL App (3d) 170681, ¶ 46. A structural error is "a systemic error which serves to erode the integrity of the judicial process and undermine the fairness of the defendant's trial."  (Internal quotation marks omitted.)  *People v. Thompson*, 238 Ill. 2d 598, 614 (2010).  "Structural errors are recognized in a very limited class

of cases, including a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, and a defective reasonable doubt instruction." *People v. Ortega*, 2021 IL App (1st) 182396, ¶ 64. The claimed error here— the improper admission and use of other crimes evidence—is not of the same character or quality as errors that have been deemed structural.

### III. CONCLUSION

¶ 28    For the reasons stated, we affirm the judgment of the circuit court of Boone County.

¶ 29    Affirmed.