2023 IL App (1st) 210144-U

No. 1-21-0144

Order filed March 31, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 8629 |
| | ) | |
| DARRELL SIMS, | ) | Honorable |
| | ) | Joan Margaret O'Brien, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Mikva concurred in the judgment.
Justice C.A. Walker dissented.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for armed habitual criminal is affirmed over his contention that, as a matter of plain error, the trial court violated his right to due process by relying on personal knowledge about fingerprints and conjecture about a defense witness's credibility to find him guilty.

¶ 2    Following a bench trial, Darrell Sims was convicted of one count of armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2016)) and sentenced to eight years in prison. On appeal, Sims contends that, as a matter of plain error, the trial court violated his right to due process

by relying on personal knowledge about fingerprints and conjecture about a defense witness's credibility to find him guilty. For the reasons that follow, we affirm.

¶ 3    Sims's conviction arose from the events of May 12, 2016. Following arrest, he was charged with one count of AHC, two counts of unlawful use of a weapon by a felon (UUWF), and four counts of aggravated unlawful use of a weapon. The State proceeded to trial on the count of AHC and one count of UUWF, and nolle-prossed the remaining counts.

¶ 4    At trial, Chicago police officer Matthew Birdsong testified that on the evening in question, he was in the area of 8535 South Kingston Avenue, which he described as a "typical Chicago ***  residential block" with an alley and several houses "up and down the street." At 7:08 p.m., Birdsong saw a man walk out from behind an abandoned building and two other men "peering out" or "poking their heads" out from behind the building. Birdsong and his two partners, Daniel Pruszewski and William Doolin, exited their vehicle and approached the building on foot.

¶ 5    Birdsong saw a group of four or five people playing dice behind the building. When the group noticed Birdsong, they "took off running in different directions." Birdsong pursued one of the men, whom he identified in court as Sims, as he ran into the alley and "crossed back into a yard approximately two doors down." At some point during the pursuit, when Birdsong was within 20 feet of him, Sims bent down and placed a dark object in the wheel-well of a sedan that was parked behind a residence. Birdsong continued to chase Sims, who fled over fences and through yards.

¶ 6    Pruszewski alerted Birdsong that Sims was on top of a garage "[a]bout three to four houses down." Birdsong ordered him to come down. In response, Sims jumped into a yard that Birdsong could not access due to a large fence. However, Doolin was able to enter that yard, and he

intercepted Sims and placed him in custody. Birdsong then returned to the sedan, which he estimated was "two to three houses maybe four" from the garage. There, Birdsong recovered a blue steel Glock model 22 .40-caliber semiautomatic handgun, loaded with 13 live rounds, from the top of the tire in the wheel-well. When asked how much time passed between when Sims placed the object in the wheel-well and when he "went back and recovered it," Birdsong answered, "It was very quick. I'd say within a minute. It was very fast." Birdsong did not recall anyone else going near or toward the sedan.

¶ 7     On cross-examination, Birdsong acknowledged that the arrest report he prepared indicated he was "working a post shooting mission." He testified that when he first saw Sims, Sims was throwing dice and placing money down. When Sims fled, Birdsong believed he was armed and dangerous because he was holding a dark object. Sims was not wearing gloves and did not have "a rag or anything" covering his hand. Birdsong acknowledged that neither he nor any other officer took a picture of the sedan. He did not recall the addresses of the properties Sims entered or of the garage from which Sims jumped off the roof. He estimated that the sedan was two houses from where he first saw Sims and three or four houses from where Sims was arrested. He lost sight of the gun for "probably about a minute" as he pursued Sims. He used a glove to recover it from the wheel-well. He recalled dice being inventoried, but did not recall whether they were recovered from Sims or the scene.

¶ 8     The parties stipulated that Sims had prior convictions for UUWF under case number 10 CF 335 and for delivery of a controlled substance under case number 06 CR 26592.

¶ 9     Sims made a motion for a directed finding, which the trial court denied.

¶ 10    LaJuana Allen testified that she lived at 8528 South Kingston Avenue. She was block president and a member of Chicago Alternative Policing Strategy (CAPS). She had known Sims as a neighbor for about 10 years, and was aware he had been to prison in the past.

¶ 11    On the date in question, Allen saw Sims while she was standing on her porch. Counsel asked her the following questions regarding when she saw Sims:

"Q. *** [W]hat time was it approximately that you saw him?

A. Midday.

Q. Can you give me a time?

A. No I cannot.

Q. Did you see him at any point around 7:00 o'clock [*sic*] in the evening?

A. 7:00 p.m.?

Q. Yes.

A. I can't say exactly that it was 7:00 p.m."

¶ 12    Allen agreed that she saw Sims "with other individuals" and confirmed that she saw him being arrested. She then answered the following questions:

"Q. When you first saw [Sims] well let's backtrack. Approximately what time did you see [Sims] get arrested at?

A. Like I said it was like midday. It wasn't like late evening. It could of [*sic*] been little bit after five.

Q. So when you say midday do you mean late afternoon?

A. Yeah late afternoon.

Q. And was it is [*sic*] still sunny out?

A. Yes."

¶ 13   Allen testified that Sims was arrested in front of 8531 South Kingston Avenue. For about 30 minutes before the police arrived and arrested him, she had been standing on her porch, talking with him and a man named Quinton. Sims and Quinton, who had family on the block, were standing on the sidewalk. Sims was holding a plastic cup. She did not see him holding a gun. Allen asked an officer why he was taking Sims to a police car, but the officer did not respond.

¶ 14   On cross-examination, Allen testified that she and Sims had been talking about a mutual friend who had passed away. When asked whether she had testified on direct that their conversation took place around 5 p.m., Allen answered, "I'm not certain as to what the time was," and "I said late afternoon. Midafternoon." Allen stated that she stopped conversing with Sims about 10 or 15 minutes before the police arrived and arrested him. During that time, she stood on her porch, looking out at the neighborhood, while Sims, Quinton, and two other men talked, laughed, and drank. The men were not shooting dice.

¶ 15   Allen started sweeping "or whatever" and gunshots rang out. She heard sirens and saw police arriving. "A few minutes later," she saw two officers chasing two individuals she did not know northwards on 85th Street. The two officers "went through the house through the gangway to the back where the alley is. And they came back through the same way." At the time, "some other boys" were shooting dice near a coach house. When the two officers arrived back at the sidewalk, they "grabbed" Sims and Quinton by their arms and took them to a squad car. The officers did not have their guns drawn.

¶ 16    On redirect, Allen stated that Sims and the other men on the sidewalk had gathered to memorialize "Rashid," who had passed away. Counsel showed Allen an exhibit consisting of a card and asked her the following questions:

"Q. *** Do you see an individual on that card?

A. This is Rashid.

Q. Does it have the date of his demise on the card?

A. Yes it does.

Q. And what is that date?

A. It says May 12th.

Q. Of what year?

A. I don't have my glasses on. I can put them on. It says May 12, 1989 to July 20, 2013."

¶ 17    The parties stipulated that if called as a witness, Robert Franks, a Chicago Police Department forensic investigator and expert in fingerprint extraction and analysis, would have testified that he processed the recovered handgun and magazine. Using all the accepted methods and processes of the scientific and forensic community, his examination "resulted in a negative finding for the presence of ridge impressions."

¶ 18    In closing, the State argued that Birdsong was credible and Allen was not.

¶ 19    Defense counsel argued the opposite, noting that Birdsong was unable to remember various addresses or explain how Sims got on the roof of a garage and stating, with regard to Allen, "If her times were off then [they were] off. Doesn't mean she didn't see what she saw." Counsel further argued that the State had not proven its case because there were no photographs depicting Sims's

position on the roof, which fences he jumped, or the location of the gun on the tire. Finally, counsel emphasized that no fingerprints were recovered from the gun despite Birdsong's testimony that Sims held it with his bare hand. Counsel argued, "It's a warm day out. There's probably if he was running there's probably some moisture from his hand. I can't speculate to that. But I can only surmise that could be what's going on."

¶ 20    In rebuttal, the State addressed the absence of fingerprints, stating:

> "[Defense counsel] himself gives reason[s] why they would not be [present]. Moisture. Sweat. Hot day out. Those all influence the ability of prints to be pulled from a gun. He even said it himself. There's moisture. Sweat. Hot. The surface of a gun is not something where if someone touches it immediately fingerprints are going to be on there. That's not the case. That is not how this works."

Defense counsel objected to the State's comments as "conclusionary." The court overruled the objection.

¶ 21    The trial court found Sims guilty of AHC and UUWF.

¶ 22    In announcing its ruling, the court explained that it did not find "anything unusual" in Birdsong's inability to recall addresses, as the crime occurred three years prior to trial. In contrast, it stated that it had "issues" with Allen's credibility. First, the court remarked, "I can't reconcile her saying that this was midday multiple times. She did ultimately say about five o'clock. But never the after 7:00 o'clock [*sic*] which is what the officer testified to. I don't know if this is the same incident." Second, the court noted that Allen initially stated that Rashid had died on May 12, but then, once she put on her glasses, read that he had been born on May 12. Noting Rashid had died in 2013, the trial court commented, "This is certainly not a recent death. It's almost three

years since it had happened. I don't know if the parties were celebrating this person's birthday. But none of that made any sense." Third, the court found it "somewhat unbelievable" that Allen would have heard gunshots and stayed outside, rather than run inside. Finally, with regard to Allen's credibility, the court said it "makes no sense" that the police would have walked up to Sims without their guns drawn if they were responding to a shooting and had just engaged in a foot chase.

¶ 23 The court then addressed the lack of fingerprint evidence, stating as follows:

"The fingerprints themselves are a wash. Counsel wants me to take that as his prints aren't on it meaning he didn't put the gun there. But that means I didn't do it somebody else did it. Somebody else put the gun there. But there's nobody's prints on the gun. So that doesn't mean anything one way or another.

And it is rare that I have ever seen fingerprints on a gun anyway. I don't find that unusual but as a wash as to whether or not this is supportive of the Sims's defense in this."

¶ 24 Finally, the court reiterated that it had "issues" with Allen's credibility and stated its finding that the State had met its burden of proving Sims guilty of AHC and UUWF.

¶ 25 Sims filed a motion for a new trial, arguing that the evidence was insufficient to prove his actual or constructive possession of the gun, that the trial court erred by limiting his cross-examination of Birdsong regarding "where the arresting officers were coming from," and that sentencing him for AHC would violate the double enhancement rule.

¶ 26 When the case was called, Sims rested on the motion. The court denied the motion. In explaining its decision, the court discussed Sims's challenge to the sufficiency of the evidence, stating, *inter alia*, "There was also a stipulation that there were no prints recovered on the gun.

However, I find that the direct testimony of the police officer as I did at the time was sufficient evidence his eyewitness testimony of seeing the Sims in possession of that handgun." The court also rejected Sims's contention that it erred in limiting his cross-examination of Birdsong, noting that whether the officers had been assigned to a shooting "mission" earlier that day was not probative in this case. Finally, the court stated that the AHC statute was constitutional and did not constitute a double enhancement.

¶ 27    The trial court subsequently sentenced Sims to eight years in prison for AHC and merged the guilty finding for UUWF. Sims filed a timely notice of appeal.

¶ 28    On appeal, Sims contends that the trial court violated his right to due process by relying on matters outside the record in finding him guilty. Specifically, Sims asserts that the court improperly relied on (1) its personal knowledge about fingerprints and (2) conjecture about Allen's credibility.

¶ 29    As an initial matter, Sims acknowledges he has forfeited his claims because he did not raise them at trial or in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Nevertheless, he asserts that we may reach the issues (1) under either prong of the plain error doctrine, or (2) because the forfeiture rule is relaxed when the trial judge's conduct is at issue.

¶ 30    Whether forfeiture may be avoided under either of these theories requires us first to determine whether the trial court erred. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (the first step of plain-error review is determining whether any error occurred); *People v. Johnson*, 238 Ill. 2d 478, 490-91 (2010) (excusing forfeiture based on the trial judge's conduct is warranted only when the trial court has overstepped its authority).

¶ 31    Sims first argues that the trial court violated his due process rights when it relied on its own personal, off-the-record opinion about fingerprint evidence. Specifically, Sims faults the court for

depending on its recollection of fingerprint evidence presented in other gun cases to find him guilty. He argues that the court's comment that it did not find the lack of fingerprint evidence in this case to be unusual because it had rarely "ever seen fingerprints on a gun anyway" was not based on any evidence presented at trial. He asserts that the court's statement rebuts the presumption that it considered only competent evidence and establishes that it improperly relied on independent personal knowledge.

¶ 32     A determination that is made by a trial judge based upon private knowledge, and thus untested by cross-examination or the rules of evidence, may result in a deprivation of due process. *People v. Pellegrini*, 2019 IL App (3d) 170827, ¶ 64. "Due process does not permit [a trial judge] to go outside the record, except for matters of which a court may take judicial notice, or conduct a private investigation in a search for aids to help him make up his mind about the sufficiency of the evidence." *People v. Yarbrough*, 93 Ill. 2d 421, 429 (1982). We review the question whether a Sims's due process rights were violated *de novo*. *Pellegrini*, 2019 IL App (3d) 170827, ¶ 64.

¶ 33     We agree with Sims that the trial court in this case erred by referencing its own personal knowledge. Its comment regarding the rarity of recovering fingerprints from guns was neither an innocuous statement nor something that the trial court could consider as a matter of life experience. Rather, the absence of fingerprints is the province of forensic science expertise, of which the State offered none. Had the trial court said nothing about the absence of fingerprints, then, as the reviewing court, we would presume it only considered admissible evidence (see, *e.g.*, *People v. Naylor*, 229 Ill. 2d 584, 603 (2008)) and not inadmissible evidence, such as its own private knowledge. However, here, the trial court affirmatively dismissed the evidentiary value of the absence of fingerprints based on its personal experience.

¶ 34 The State argues that "if this Court finds that the trial court's comment [regarding fingerprints] was improper, reversal would not be warranted because any error would be harmless." In harmless error analysis, the State bears the burden of proving that the outcome of the trial would have been the same absent the error. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). However, a court of review will only undertake a harmless error analysis where the defendant has preserved the claim for appeal. *Thompson*, 238 Ill. 2d at 611. Where, as here, the defendant's claim has been forfeited, plain error is the appropriate analysis. *Id.* Under both prongs of the plain error doctrine, the defendant bears the burden of persuading the reviewing court to excuse his forfeiture. *People v. Jackson*, 2022 IL 127256, ¶ 19.

¶ 35 Under the plain error doctrine, a reviewing court may consider an unpreserved claim of error when:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill.2d 551, 565 (2007).

As noted above, Sims argues that we may reach the issue of the trial court's reference to its personal knowledge of the nature of fingerprint evidence under either prong of the plain error doctrine.

¶ 36 Under first prong plain error, when the evidence is closely balanced, " 'there is the possibility that an innocent person may have been convicted because of some error which is

obvious in the record, but which was not properly preserved for review.' " *Jackson*, 2022 IL 127256, ¶ 23 (quoting *People v. Green*, 74 Ill. 2d 444, 454 (1979) (Ryan, J., specially concurring)). A reviewing court may consider an unpreserved error under the first prong of the plain error doctrine because convicting an innocent defendant due to a trial error would be a miscarriage of justice. *Id.* Under first-prong analysis, the defendant is required to establish prejudice resulting from the error to excuse his forfeiture. *Id.*

¶ 37     A defendant claiming first prong error must prove that the evidence at trial was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). In determining whether the evidence was closely balanced, a reviewing court evaluates the totality of the evidence and conducts a qualitative, commonsense assessment of the evidence within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53. As such, we must assess not only the evidence on the elements of the charged offense, but also any evidence regarding the witnesses' credibility. *Id.*

¶ 38     Evidence is closely balanced if the outcome of the case "turned on how the finder of fact resolved a 'contest of credibility.' " *Id.* ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008)). A contest of credibility exists where both sides presented evidence that was "largely consistent," neither version of events was less plausible than the other, and there was no extrinsic evidence to corroborate or contradict either version. *Id.* ¶¶ 60-63. If the defendant meets his burden of proving the evidence was closely balanced, he has demonstrated actual prejudice and his conviction should be reversed. *Id.* ¶¶ 51, 64.

¶ 39     Here, Sims argues that the evidence was closely balanced because Birdsong and Allen testified to two different versions of events, which "made the trial a contest of credibility." We

disagree with this conclusory assertion. Birdsong's testimony was internally consistent. Allen, on the other hand, contradicted herself numerous times regarding what time the events at issue occurred. Specifically, she variously stated that it was midday, that she could not "say exactly" that it was 7 p.m., that it was not "like late evening," that it could have been a "little bit after five," that it was late afternoon, that she was not certain as to what time it was, and that it was mid-afternoon. We are also mindful of the trial court's finding, regarding Allen's account, that it "makes no sense" that the police would have walked up to Sims without their guns drawn if they were responding to a shooting and had just engaged in a foot chase.

¶ 40    Keeping in mind that we must make a commonsense assessment of the evidence (*Sebby*, 2017 IL 119445, ¶ 53), we cannot ignore the deficiencies in Allen's testimony. The trial court was not presented with two equally credible versions of events, but, rather, on the one hand, Birdsong's consistent narrative, and on the other, Allen's equivocal and problematic testimony, which set forth a less plausible storyline. See *People v. Adams*, 2012 IL 111168, ¶¶ 22-23 (evidence was not closely balanced where the defendant's explanation of events was logically possible but highly improbable). In the context of this case, we cannot say that Sims has proved the evidence was closely balanced such that his forfeiture should be excused. See, *e.g.*, *People v. Westfall*, 2018 IL App (4th) 150997, ¶¶ 80-81 (evidence was not closely balanced where the defendant contradicted himself numerous times when presenting his version of events); *People v. Boston*, 2018 IL App (1st) 140369, ¶ 100 (evidence was not closely balanced where, *inter alia*, the defendant's testimony was inconsistent and he could not accurately recall the timeline of events). Although the evidence of Sims's guilt might not have been overwhelming, it was not so closely balanced that the trial court's error threatened to tip the scales of justice against him. As such, it was not closely balanced

for purposes of plain error. See *People v. Olla*, 2018 IL App (2d) 160118, ¶ 38. Sims's argument that we may reach his claim via first-prong plain error fails.

¶ 41     We similarly reject Sims's contention that we should reach the issue of the trial court's reference to its personal knowledge of the nature of fingerprint evidence under the second prong of the plain error doctrine. Sims argues, without elaboration, that second-prong plain error review is justified because the trial court's reliance on private knowledge in reaching its decision "clearly implicates a defendant's due process right to a fair trial."

¶ 42     As noted above, forfeiture is excused under the second prong of the plain error doctrine where "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. Our supreme court has held that second-prong plain errors are akin to structural errors, which serve to erode the integrity of the judicial process and undermine the fairness of the defendant's trial. See *People v. Clark*, 2016 IL 118845, ¶ 46; *People v. Thompson*, 238 Ill. 2d 598, 608-609, 613 (2010). Such errors render "a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *Thompson*, 238 Ill. 2d at 609. Examples of structural errors include the complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Id.* While second-prong plain error is not restricted to these six types of structural error, "the error nevertheless must be of a similar kind," that is, it must be an error that affects the framework within which the trial proceeds, rather than simply an error in the trial process itself. *People v. Johnson*, 2017 IL App (2d) 141241, ¶ 51.

¶ 43    The error here did not affect the framework within which Sims's trial proceeded. Rather, the trial court's consideration of its personal knowledge regarding the rarity of fingerprints on firearms was an error in the trial process itself in that, in effect, it resulted in the court considering improper evidence. We cannot find that this error is of the same character or quality as errors that have been deemed structural by our supreme court. See *People v. Bever*, 2019 IL App (3d) 170681, ¶¶ 33, 45-47 (trial judge's consideration of his own son's military experience when assessing the credibility of the witnesses did not rise to the level of structural error); *People v. Temple*, 2014 IL App (1st) 111653, ¶ 51 ("admission of prior consistent statements, hearsay testimony from police officers going beyond the scope of explaining police procedure, and prosecutorial misconduct in closing and rebuttal arguments, do not fall under the umbrella of structural error"); see also *People v. Evans*, 2021 IL App (2d) 200469-U, ¶ 27 (finding the improper admission and use of other crimes evidence to be "not of the same character or quality as errors that have been deemed structural" for purposes of second-prong plain error); Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (nonprecedential appellate court orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 44    A defendant arguing for the application of the second prong of the plain error doctrine bears the burden of persuasion to show that a clear or obvious error warrants reversal because that error " 'is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process.' " *Thompson*, 238 Ill. 2d at 613 (quoting *Piatkowski*, 225 Ill. 2d at 565). Here, Sims has not persuaded us that the trial court's error rises to the level of second-prong plain error. See *Johnson*, 2017 IL App (2d) 141241, ¶ 51 (second-prong plain error did not apply where

error "resulted merely in the introduction of improper evidence"). Sims's argument that we may reach his claim via second-prong plain error fails.

¶ 45   We next turn to Sims's argument that we should reach the issue regarding the trial court's personal knowledge of fingerprint evidence because forfeiture is not rigidly applied where the basis for the objection is the conduct of the trial judge. This principle is commonly referred to as the "*Sprinkle* doctrine," as it arises from *People v. Sprinkle*, 27 Ill. 2d 398, 401 (1963). It applies only in extraordinary circumstances, such as when a judge oversteps his or her authority in the presence of the jury, counsel has been effectively prevented from objecting because an objection would have "fallen on deaf ears," a judge makes inappropriate remarks to a jury, or the judge relies on social commentary as opposed to evidence in imposing a death sentence. *Thompson*, 238 Ill. 2d at 612.

¶ 46   Here, Sims has identified no such extraordinary circumstance warranting the relaxation of the forfeiture rule. Moreover, there is no indication that the trial court would have ignored an objection had one been made. In fact, Sims makes no argument for application of the *Sprinkle* doctrine beyond a bare assertion that the rule is well-established. In the absence of a compelling argument and reason for its use, we decline to excuse Sims's forfeiture based on *Sprinkle*. See *id.*

¶ 47   Sims next argues that the trial court "improperly relied on its personal opinion in discounting Allen's testimony." Specifically, he asserts it was improper for the trial court to opine that it was unreasonable for people to celebrate the birthday of a friend who had died three years prior. He further asserts that it was improper for the trial court to find Allen's testimony about hearing gunshots implausible based on its speculation that she would not have stayed on her porch

if she actually heard shots. He argues that, in the absence of any evidence regarding how close by the gunshots were, the trial court's assumption was baseless.

¶ 48    In a bench trial, it is the function of the trial court to determine the credibility of witnesses, weigh the evidence, draw reasonable inferences therefrom, and resolve any conflicts in the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). The trial court is "free to accept or reject as much or as little as it pleases of a witness' testimony." *People v. Nelson*, 246 Ill. App. 3d 824, 830 (1993). Moreover, "A trial judge does not operate in a bubble; she may take into account her own life and experience in ruling on the evidence." *People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007).

¶ 49    Here, Allen testified, among other things, that on May 12, 2016, Sims and the other men on the sidewalk had gathered to memorialize their friend Rashid. When she was shown a card in court, she stated it indicated Rashid was born on May 12, 1989, and died on July 20, 2013. Allen also testified that in the 10- to 15-minute window of time between when she stopped conversing with Sims and when he was arrested, she stood on her porch, looking out at the neighborhood, started sweeping, heard gunshots and sirens, saw two police officers chase two individuals she did not know "through the house through the gangway to the back where the alley is," and then saw the same two officers return to the sidewalk, where they "grabbed" Sims.

¶ 50    When announcing its findings, the trial court stated it had "issues" with Allen's credibility. Noting that Rashid's death was not recent, the court stated, "I don't know if the parties were celebrating this person's birthday. But none of that made any sense." The court also stated it was "somewhat unbelievable" that Allen stayed on her porch after hearing gunshots, rather than run inside.

¶ 51    These comments do not reflect personal knowledge of the facts of this case and were not based upon any sort of private investigation. Instead, the trial court was merely discussing the evidence that was presented at trial via Allen's testimony and making a credibility determination regarding that testimony based on its own life experience. See *People v. Christensen*, 2021 IL App (1st) 192579-U, ¶¶ 56-59 (finding the trial court did not improperly rely on its personal experience as a public-school student, but rather, engaged in its duty of weighing the evidence, making inferences from the evidence, and determining the credibility of the witnesses); *People v. Williams*, 2021 IL App (4th) 190251-U, ¶¶ 44, 46 (finding no error where trial judge relied upon his own personal preexisting and general knowledge of working farms, and did not conduct a private investigation of the evidence or rely upon private knowledge of the facts of the case); Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (permitting citation of nonprecedential orders entered on or after January 1, 2021, for persuasive purposes). The trier of fact is entitled to use her general knowledge and observations in life when considering the evidence presented. See *Thomas*, 377 Ill. App. 3d at 963. We find that the trial court committed no error in making these statements. Sims's argument remains forfeited.

¶ 52    Finally, we note Sims's argument that the trial court should not have found Allen incredible based on her testimony regarding what time the events at issue occurred. He acknowledges that Allen initially identified the time in question as "midday," but asserts that she "confirmed" it was sunny out and not late evening. Asking this court to take judicial notice that the sun set at 8:01 p.m. on the date in question, Sims argues that Allen correctly remembered that the events occurred during daylight hours. He maintains that "any discrepancy between whether [his] arrest happened

at midday or early evening is a collateral issue that is not relevant to [Allen's] credibility or any disputed issue in the case."

¶ 53    Sims's argument involves a matter of credibility that is for the trial court to resolve in its role as trier of fact. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). It is the task of the trier of fact to determine when a witness testified truthfully and to decide how flaws in any part of the testimony affect the credibility of the whole. *People v. Gray*, 2017 IL 120958, ¶ 47. A reviewing court will not substitute its judgment for that of the trier of fact on issues involving the credibility of the witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 54    Here, the trial court saw and heard Allen testify. As such, it was in a much better position than this court to determine her credibility. *Siguenza-Brito*, 235 Ill. 2d at 229. At the conclusion of trial, the court listed four reasons it found Allen's testimony incredible, only one of which was her equivocal statements regarding the time of Sims's arrest. The court chose to believe Birdsong over Allen, which was its prerogative in its role as the trier of fact. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 52. The record before us provides no reason to disturb the trial court's credibility determination. Sims's argument fails.

¶ 55    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 56    Affirmed.

¶ 57    JUSTICE C.A. WALKER, dissenting:

¶ 58    I agree with the majority that the trial judge erred by referencing a personal opinion and relying on a personal, off-the-record belief about the lack of fingerprint evidence. However, I disagree with the majority's finding that the trial judge properly relied on a personal opinion in weighing the credibility of Ms. LeJuana Allen's testimony. Ms. Allen is a college graduate who

had worked as an executive assistant to the vice president of the Chicago Housing Authority and, at the time of trial, worked for the Gary Housing Authority. She served as a member of the Chicago Alternative Policing Strategy (CAPS) and as block president. I also disagree with the majority's finding that no plain error occurred. Hence, I respectfully dissent.

¶ 59    On appeal, Sims asserts, during its determination of guilt, the trial judge improperly relied on personal opinions that (1) it was unreasonable for people to celebrate the birthday of a friend who had died three years prior; (2) fingerprint evidence is rarely found; and (3) Ms. Allen's testimony about hearing gunshots was incredible because she would not have stayed on her porch if she heard shots. Specifically, the trial judge stated: "The testimony about hearing gunshots ring out about 15 minutes after she had a conversation with the defendant. I didn't hear anything about her running inside. Nothing. Just that she continued to stay out there. That's somewhat unbelievable to me." Regarding the fingerprint evidence, the trial judge stated:

"The fingerprints themselves are a wash. Counsel wants me to take that as his prints aren't on it meaning he didn't put the gun there. But that means I didn't do it somebody else did it. Somebody else put the gun there. But there's nobody's prints on the gun. So that doesn't mean anything one way or another.

And it is rare that I have ever seen fingerprints on a gun anyway. I don't find that unusual but as a wash as to whether or not this is supportive of the defendant's defense in this."

¶ 60    Furthermore, the judge commented on Ms. Allen's testimony that she and Sims were speaking about memorializing a friend named Rashid, who passed away in 2013, before Sims was arrested. The judge stated, "This is certainly not a recent death. It's almost three years since it had

happened. I don't know if the parties were celebrating this person's birthday. But none of that made any sense." The majority held, "the trial court was merely discussing the evidence that was presented at trial via Ms. Allen's testimony and making a credibility determination regarding that testimony based on the court's own life experience." *Supra* ¶ 51.

¶ 61    In a bench trial, the trial judge is presumed to have considered only competent evidence, but the presumption may be rebutted by affirmative evidence in the record, including statements of the trial judge. *People v. Kent*, 111 Ill. App. 3d 733, 740 (1982). "A judge need not give controlling weight to the improper evidence to trigger our reversal; even giving 'very little weight' is improper." *People v. Dameron*, 196 Ill. 2d 156, 178 (2001).

¶ 62    Our supreme court held, "A determination made by a trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process." *Id*. at 171-72; See *People v. Harris*, 57 Ill. 2d 228 (1974); *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962); See also *People v. Barham*, 337 Ill. App. 3d 1121, 1135 (2003) (when serving as a fact-finder, a judge is limited to the record made before him or her in open court, and a ruling based on information outside of the record "constitutes a denial of due process"). Due process does not permit the trial court to consider information outside of the record to aid in its decision-making, except for matters in which a court may take judicial notice. *People v. Yarbrough*, 93 Ill. 2d 421, 429-30 (1982).

¶ 63    A trial judge's determination based on a personal opinion is improper where the opinion was from off-the-record, private knowledge. *People v. Jackson*, 409 Ill. App. 3d 631 (2011); *People v. White*, 183 Ill. App. 3d 838 (1989). For instance, in *Jackson*, the defendant raised a defense of insanity at his bench trial for first degree murder. 409 Ill. App. 3d at 633. During trial,

the judge stated that he knew the medications the defendant received were not evidence of mental illness but were "given proactively for people in incarcerated circumstances," although no evidence was presented to support its statement. *Id.* at 637, 650. The judge also stated IQ testing is a "total canard. I don't see the relevance of IQ in this case" despite defense expert testimony that the difference between the defendant's verbal and performance IQ scores was significant evidence of mental disease. *Id.* at 643, 645, 650. This court reversed the defendant's conviction, finding the trial judge relied on his own private knowledge, untested by cross-examination. *Id.* at 650.

¶ 64    In *White*, the trial court conducted a hearing on the State's petition to revoke the defendant's probation for allegedly committing an aggravated battery. 183 Ill. App. 3d at 838-39. The complainant testified the defendant cut him, and the defendant testified the complainant fell on a bottle. *Id.* at 839. Based on its personal examination of the complainant's wound, the court found that the location and pattern of the wound indicated that it had been inflicted by a knife rather than by a bottle. *Id.* at 840. The Third District of this court found that the trial judge's ability to examine a cut and determine the instrument that inflicted the cut was not within the province of common knowledge, and the parties could only introduce this type of evidence through a qualified expert. *Id.* at 841. Because no evidence was presented on the matter, the trial court erred in considering facts not in evidence. *Id.* Finding plain error, the Third District reversed the trial court's decision. *Id.*

¶ 65    Here, as to the judge's opinion about the lack of fingerprint evidence, I agree with the majority's finding that the trial judge's "comment regarding the rarity of recovering fingerprints from guns was neither an innocuous statement nor something that the trial court could consider as

a matter of life experience." *Supra* ¶ 33. Additionally, like *Jackson* and *White*, the judge's opinion was not based on the record. Officer Birdsong testified that Sims was not wearing gloves and had nothing covering his hands when he bent down next to the car. Furthermore, there was no evidence presented at trial that the circumstances of the day, including moisture, sweat, and heat, were possible contributors to the absence of fingerprints on the gun. Indeed, the State presented no evidence as to the likelihood of recovering fingerprints from the surface of a gun. Therefore, the trial judge's improper statements regarding the lack of fingerprint evidence rebut the presumption that it considered only competent evidence.

¶ 66    As to the trial judge's opinion about Ms. Allen's response to the gunshots, there was no testimony regarding the distance of the gunshots or if Ms. Allen was concerned for her safety at that time. Thus, the judge's opinion that Ms. Allen was not credible because she stayed outside after hearing gunshots was "beyond the province of common knowledge." See *People v. White*, 183 Ill. App. 3d 838, 841 (1989). The parties could only elicit this information through cross-examination or a qualified expert on gunshots. As to the judge's opinion about Sims and Ms. Allen's conversation on memorializing Rashid, without any evidence to explain or contradict the context of the celebration, the trial judge's opinion is also beyond the province of common knowledge. In fact, the evidence supports Ms. Allen's testimony that she and Sims were celebrating Rashid's birthday. At trial, Ms. Allen stated, on May 12, 2016, she and Sims gathered to memorialize their friend Rashid before Sims was arrested. Ms. Allen testified to a card that stated Rashid was born on May 12, 1989. The trial judge found, to the contrary of the trial evidence, none of Ms. Allen's testimony regarding the celebration "made any sense."

¶ 67 Indeed, the judge's opinion raises concerns about the misunderstanding of culture and customs when making a credibility finding. As one journal article stated:

> "When judges adjudicate cases, they use not only legal knowledge, but also knowledge about the world. The source of the judges' knowledge about the world is their 'common sense,' which is the intangible cultural system that contains people's informal knowledge about the world from their social group's point of view. Insomuch as the judges' interpretation about the world is limited to their social group's interpretation, the proceedings regarding parties who do not share the judges' group's cultural perspective may be unjust." Masua Sagiv, *Cultural Bias in Judicial Decision Making*, 35 BCJLSJ 229, 229-30 (2015).

Contrary to the trial judge's opinion, remembering deceased loved ones on their birthday and death date, even years after their passing, is common. ). Hart Haragutchi and Benjamin Troy, *14 Ways to Remember Someone On Their Death Anniversary,* Choosing Therapy, Updated March 17, 2023, available at https://www.choosingtherapy.com/death-anniversary (last visited on 3/21/2023) (Death anniversaries are a day to set aside time, observe your loss, and honor the impact your lost loved one had on your life).

¶ 68 Here, the evidence is closely balanced. As the majority states, evidence is closely balanced if the outcome of the case "turned on how the finder of fact resolved a 'contest of credibility.' " *People v. Sebby*, 2017 IL 119445, ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008)). Had Birdsong's trial testimony been the only account of the arrest, the trial judge's conclusion might be warranted. However, because of Ms. Allen's testimony, there was another explanation for Sims's arrest that would have resulted in no fingerprint evidence on the weapon—that is Sims

was arrested while standing on the sidewalk without having led police on a chase and placing a weapon in the wheel well, as Ms. Allen testified. No other evidence was introduced to overwhelmingly corroborate either testimony. The State's argument that the trial was not a contest of credibility is unfounded. The judge's improper comments constitute first prong plain error. See *People v. Naylor*, 229 Ill. 2d 584, 608 (2008) (finding where the trial court relied on improper evidence in assessing the credibility of a defense witness and the case turned on two different versions of events, the evidence was closely balanced).

¶ 69 The majority admits that the evidence of Sims's guilt was not overwhelming, but it was not so closely balanced that the trial judge's error threatened to tip the scales of justice against him. *Supra* ¶ 40. The majority explains:

> "Birdsong's testimony was internally consistent. Ms. Allen, on the other hand, contradicted herself numerous times regarding what time the events at issue occurred. Specifically, she variously stated that it was midday, that she could not 'say exactly' that it was 7 p.m., that it was not 'like late evening,' that it could have been a 'little bit after five,' that it was late afternoon, that she was not certain as to what time it was, and that it was mid-afternoon."
>
> *Supra* ¶¶ 39.

However, while Ms. Allen's timeline reveals slight variations, her testimony was not wholly inconsistent. Rather, Ms. Allen's testimony largely suggests she saw Sims when it was still sunny out but not late evening. See *People v. Gregory*, 43 Ill. App. 3d 1052, 1055 (1976) ("Slight discrepancies do not destroy the credibility of an eyewitness but only go to the weight to be given [her] testimony."). The defendant asks this court to take judicial notice that sunset in Chicago was at 8:01 p.m., and it would have still been sunny at 7 p.m., the time Ms. Allen saw the police arrest

Sims. See Ill. R. Evid. 201(b); *Owens v. Duncan*, 781 F.3d 360, 362 (7th Cir. 2015) (recognizing courts may take judicial notice sunrise and sunset time). While Ms. Allen may not remember the exact time of the arrest, the time of sunset on that day corroborates Ms. Allen's testimony that it was still daylight. The majority also states Ms. Allen "set forth a less plausible storyline." *Supra* ¶ 40. Yet, as previously stated, many of the trial judge's credibility findings improperly relied on personal opinion, and therefore, cannot be a basis for assessing Ms. Allen's credibility.

¶ 70    Moreover, the judge's error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The majority states, "The error here did not affect the framework within which Sims's trial proceeded." However, our supreme court established a defendant's due process right to a fair trial is violated when a trial court relies on private knowledge, untested by cross-examination, or any of the rules of evidence. *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001); *People v. Yarbrough*, 93 Ill. 2d 421, 429-30 (1982); *People v. Harris*, 57 Ill. 2d 228 (1974); *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962). "[S]ince the essence of due process is 'fundamental fairness,' due process essentially requires 'fairness, integrity, and honor in the operation of the criminal justice system, and in its treatment of the citizen's cardinal constitutional protections.' " *People v. Stapinski*, 2015 IL 118278, ¶ 51 (quoting *People v. McCauley*, 163 Ill. 2d 414, 441 (1994)). Thus, the judge's improper comments also constitute second prong plain error.

¶ 71    The majority rejects Sims's argument that the forfeiture is not rigidly applied where the basis for the objection is the trial judge's conduct because Sims failed to identify an extraordinary circumstance warranting the relaxation of the forfeiture rule as stated in *People v. Sprinkle*, 27 Ill. 2d 398, 401 (1963), and there was no indication that the trial court would ignore an objection.

*Supra* ¶¶ 45-46. However, in *People v. Sims*, 192 Ill. 2d 592, 636 (2000), our supreme court relaxed the forfeiture rule in a similar case involving a judge's alleged improper comments during a sentencing hearing. Following our supreme court's direction, forfeiture should be relaxed in this case.

¶ 72     Here, I would find that the trial judge improperly relied on personal opinions about a defense witness's credibility and fingerprint evidence that was outside of the record in making the guilty determination. Plain error occurred because the evidence, which turned on a contest of credibility, was closely balanced. I would also find that Sims was denied due process because the judge's error was so serious that it affected the fairness of the trial and challenged the integrity of our judicial process. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Hence, I would reverse and remand the case for a new trial. *People v. Drake*, 2019 IL 123734, ¶ 20 (Although the double jeopardy clause forbids the retrial of a defendant to afford the State another opportunity to present evidence it failed to present in the first trial, it "does not preclude retrial when a conviction has been overturned because of an error in the trial proceedings").

¶ 73     Accordingly, I respectfully dissent.